# EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff, Appellant,

v.

# COLBY COLLEGE et al., Defendants, Appellees.

## No. 78–1010.

United States Court of Appeals, First Circuit.

Argued Oct. 4, 1978.
Decided Dec. 18, 1978.

Coffin, Chief Judge, filed a concurring opinion.

Vella M. Fink, Atty., Washington, D. C., with whom Abner W. Sibal, Gen. Counsel, Joseph T. Eddins, Jr., Associate Gen. Counsel, and Beatrice Rosenberg, Asst. Gen. Counsel, Washington, D. C., were on brief, for appellant.

S. Mason Pratt, Jr., Portland, Me., and William R. Glendon, New York City, with whom James E. Purcell, Pierce, Atwood, Scribner, Allen, Smith & Lancaster, Portland, Me., James B. Weidner, James W. Paul, and Rogers & Wells, New York City, were on joint brief of appellees Colby College, Teachers Ins. and Annuity Ass'n and College Retirement Equities Fund.

Before COFFIN, Chief Judge, ALDRICH and BOWNES, Circuit Judges.

ALDRICH, Senior Circuit Judge.

Appellee Colby College is a private, coeducational liberal arts college, located in Waterville, Maine. Since 1935, with respect to annuities, and 1956 with respect to life insurance, it has insured most of its faculty,[1] and a portion of its administrative

---

1. There is a brief waiting period, except for faculty members who come from other institutions already so insured.

staff, under a contributory pension plan with appellee Teacher Insurance Annuity Association (TIAA).[2] The plan also provides for decreasing term life insurance up to age 70. TIAA is a nonprofit, legal reserve life insurance company operating nationwide, and presently covering some 2800 educational institutions. It was founded in 1918 by The Carnegie Foundation for the Advancement of Teaching as a quasi-public service, and may offer special features for its unique clientele, but for present purposes it in no way differs from any other legal reserve insurance company. This suit was brought by the Equal Employment Opportunity Commission (EEOC) against Colby as the result of a charge by a woman faculty member that she had been discriminated against on the basis of sex with respect to her annuity in violation of section 703(a)(1) of Title VII of the Civil Rights Act of 1964.[3] Appellees TIAA and CREF are not charged with violation of Title VII, but were named as parties having an interest in the outcome of the litigation under F.R. Civ.P. 19(a).

Colby may quarrel with our shorthand statement that it insures its faculty with TIAA, but we quarrel even more with its contention that it is divorced altogether from the transaction and not to be charged with violation of Title VII because of the fact that TIAA makes separate contracts with the individual faculty members and other Colby employees. It is true that TIAA is the carrier, and that the insured employee looks solely to it for payment, but Colby is more than a broker, or other intermediary, that enables the parties to enter into the arrangement. As one district court has observed in a case presenting an identical challenge to the TIAA plan, an educa-tional institution's adoption of TIAA "constitutes affirmative, active participation," without which "the challenged program could not operate." *Spirt v. TIAA*, S.D. N.Y., 1976, 416 F.Supp. 1019, 1021, 1022. Colby requires participation in the plan for all eligible employees and the amount of premium payments is determined under a formula established by Colby.[4] Its contention that the "difference in benefit payments does not depend upon the employment 'relations between Colby and its employees'" is altogether too facile.

The eligibility and contribution formulas established by Colby are based upon the salary and position of the particular employee, and not in any degree on sex. The asserted discrimination is that the ultimate monthly annuity payments to women are smaller than those made to their male counterparts. This disparity results from the fact that TIAA, as do legal reserve companies generally, determines the amount of coverage it will supply for a given premium by the use of mortality tables, segregated by sex. These tables are based upon the fact that, taken as a group or class, women have a greater life expectancy than men. Consequently, TIAA, in return for the total premium payment tendered by and on behalf of each individual future annuitant, provides smaller annuity payments to women employees of the same years in the plan, age and salary as men, because the women insureds, as a group, will live longer after retirement, and hence receive more payments, than the men.

The smaller individual annuity payment to women is not a chauvinistic distinction. The use of such mortality tables produces the converse situation in the case of life insurance. Since, as a group, the men will

2. Another carrier, appellee herein, College Retirement Equities Fund (CREF), presents no different questions and will be disregarded for the purposes of this opinion.

3. In pertinent part, section 703(a)(1) provides that it shall be an unlawful employment practice for an employer—

"(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e–2(a)(1) (1976).

4. Basically, the formula calls for a fixed percentage of the employee's salary, and a stated contribution by Colby, for which TIAA, in accordance with set tables, and conventional practice, promises a stated monthly annuity.

live a shorter time, the total group will pay fewer premiums before their policies mature. It is, of course, the premiums, and the accumulated interest, that provide the basis for the payout. Hence the insurer cannot afford to pay out as much to the men as a group based on the same annual premium, or as an inevitable corollary, to its male policyholders individually, as it would in the case of women, who as a class, would pay more premiums before they died and their policies matured. Hence Colby's male employees, individually, receive smaller death benefits than their female counterparts. So far as any discrimination because of sex is concerned, however, there is no difference in principle between the annuity and the life insurance programs, except that the one favors men as a class and the other women. For the balance of this opinion we will consider only the annuities, as to which women complain.

The district court found that as of any given moment, the actuarial value of TIAA's annuity contracts written on employees of the same age, salary, length of service, and hence premium contributions, was the same, regardless of the fact that the monthly payments were larger for men than for women.[5] *Equal Employment Opportunity Commission v. Colby College,*

D.Me., 1977, 439 F.Supp. 631, 634. This finding is not only not contested, it is assumed. The complaint is not that TIAA has been fudging mortality tables, but to the consequences of their use. The complaint is that if the male annuitant is to receive $120 a month on retirement at 65, so, under the Act, should the premium-equivalent female, even though on the basis of normal life expectancy she may expect to receive payments for twelve years, and he for ten.

Noting this actuarial equivalency, the district court held that there was no unlawful discrimination and dismissed the action. *Equal Employment Opportunity Commission v. Colby College,* ante. The court based this conclusion upon the fact that administrative interpretations of the Equal Pay Act, 29 U.S.C. § 206(d)(1),[6] which qualifies the reach of Title VII, *see* 42 U.S.C. § 2000e–2(h)[7] by providing that disparities in wages paid to employees of different sexes are not unlawful if the differential is "based on any other factor other than sex," had sanctioned plans such as Colby's where the employer's contributions are equal for both sexes, but benefits are unequal. *See* 29 C.F.R. § 800.116(d) (1976).[8] The Commission appeals, relying on *Los*

---

5. In simple terms, and disregarding the interest factor, the present worth of a contractual obligation to pay $120 a month for, say, ten years, is the same as that to pay $100 a month for twelve.

6. The Equal Pay Act provides, in part:
   "No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: *Provided,* That an employer who is paying a wage rate differential in violation of this sub-

section shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee." 29 U.S.C. § 206(d)(1) (1976).

7. Section 703(h) of Title VII, the so-called Bennett Amendment, provides in part:
   "It shall not be an unlawful employment practice under this title for any employer to differentiate upon the basis of sex in determining the amount of the wages or compensation paid or to be paid to employees of such employer if such differentiation is authorized by the provisions of section 206(d) of Title 29." 42 U.S.C. § 2000e–2(h) (1976).

8. 29 C.F.R. § 800.116(d) (1976) reads in pertinent part:
   "If employer contributions to a plan providing insurance or similar benefits to employees are equal for both men and women, no wage differential prohibited by the equal pay provisions will result from such payments, even though the benefits which accrue to the employees in question are greater for one sex than for the other."

*Angeles Dep't of Water & Power v. Manhart*, 1978, 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657, decided by the Court subsequent to the district court's opinion.

In *Manhart*, the employer Department adopted a compulsory contributory pension plan, under which it was a self-insurer, that provided for equal annuity payments for men and women. Using sex-segregated mortality tables, this equivalence called for larger premium payments on account of female employees, and the Department made larger contributions of its own, and larger payroll deductions accordingly. In an action brought by the Commission, as the result of a complaint by a female employee, the Court held that requiring women to make larger premium payments discriminated against them within the intent of the Act.

Recognizing that the additional cost of the female annuities was fairly determined in the light of women's greater longevity as a class, the Court responded, at p. 708, 98 S.Ct. at p. 1375:

> "The statute makes it unlawful 'to discriminate against any *individual* with respect to his compensation, terms, conditions or privileges of employment, because of such *individual's* race, color, religion, sex, or national origin.' 42 U.S.C. § 2000e–2(a)(1) (emphasis added). The statute's focus on the individual is unambiguous. It precludes treatment of individuals as simply components of a racial, religious, sexual, or national class."

The Court concluded, in other words, that it was not enough that individual women received the same annuity as comparable men; their contributions, too, must be equal even though it was clear that the women employees, as a class, would receive more for their money.

The Court also rejected a defense under the Equal Pay Act, similar to that asserted by respondents here. The Department had argued that the different contributions required from men and women in order to provide equal benefits were based on the factor of longevity, not sex. Noting the absence of evidence that any factor other than sex was considered in calculating the contribution differential, the Court concluded that "one cannot 'say that an actuarial distinction based entirely on sex is "based on any other factor other than sex." Sex is exactly what it is based on.'" *Id.,* at 712–713, 98 S.Ct. at 1377–1378, quoting *Manhart v. Los Angeles Dep't of Water & Power*, 9 Cir., 1977, 553 F.2d 581, 588. Appellees here seek to distinguish that case.

Whether by accident, or design, *Manhart* brought to the Court the case that presented the fewest difficulties, and the most conspicuous discrimination, if discrimination there were. The female employees, obliged to suffer larger payroll deductions, and hence receive less take-home pay than their male counterparts, could point to an immediate and obvious disparity of treatment, and indeed did so, at great length, by affidavits and brief. They could well prefer bread on the table to pie in the sky, even though fairly costed. Had it wished to, we believe the Court could have found discrimination in this fact alone. However, it chose a different route, and we cannot reject the rationale of its decision because it could have taken another course.

Neither can we listen to TIAA's plaints that to decide this case in favor of the EEOC would require it to disregard actuarial experience in computing costs and benefits. The Court did not call for such. To the contrary, it said, perhaps as a result of spectres raised by a number of amici briefs filed by representatives of the industry, including TIAA, that it did "not suggest that the statute was intended to revolutionize the insurance and pension industries." 435 U.S. at 717, 98 S.Ct. at 1380. Had the Court done otherwise, it would have created a serious problem for companies required by law in nearly every state in which they do business to satisfy the local insurance commissioner that their practices are financially sound. We could not rule, however, that it would be impossible to frame a decision in favor of EEOC without offending that principle.

Most of all we reject appellees' contention based on the Court's statement that

"[a]ll that is at issue today is a requirement that men and women make unequal contributions to an employer-operated pension fund." *Id.* Appellees would have us overlook the virtue of the common law that what is decided in one case, and, particularly as concerns inferior courts, what is said in one case, are guides for future cases where different, but comparable issues, are presented. We find the issues in the instant case highly comparable to *Manhart.*

If the statute's "focus on the individual" forbids an employer from treating women as a class with respect to annuities so as to require from them higher premiums, although they as a class receive more for their money, it is difficult to perceive a distinction that would permit a plan whereby women make contributions equal to those of men, but receive smaller monthly payments. The same would appear with regard to the Court's treatment of the Equal Pay Act. If the actuarial distinction arising from sex-segregated mortality tables failed to qualify as a "differential based on any other factor other than sex," in *Manhart,* one must ask how that same distinction can qualify here, especially since appellees, like the Department in *Manhart,* have presented no evidence that any factor other than sex was considered in arriving at the benefit differential.[9]

Nor can we accept the argument that, because equal contributions are made, there is not, in fact, any discrimination. Appellee suggests that the college has done all it can do by making equal contributions on behalf of both men and women and that there is no employment discrimination simply because a woman happens to be able to buy a different annuity with her money than can a man with the same amount of money. Even aside from what we have already said about Colby being an active participant in the insurance and annuity plan, the fact is that the contributions are not made in the form of a payment with which the employee may do whatever he or she desires. Rather, the contributions may be used only to buy an annuity or life insurance policy with the foreknowledge that the woman's dollar can buy a different amount in those markets than can a man's.

This is not to say, in anticipation of our returning this case to the district court, that we do not foresee difficulties, possibly very great difficulties, that did not arise in *Manhart,* in light of the Court's caveat that the statute was not intended to revolutionize the industry. The Court said,

> "[our holding does not] call into question the insurance industry practice of considering the composition of an employer's work force in determining the probable cost of a retirement or death benefit plan. Finally, we recognize that in a case of this kind it may be necessary to take special care in fashioning appropriate relief." *Id.,* at 718, 98 S.Ct. at 1380. [Footnote omitted.]

Without in any way intending to be binding, we will comment briefly on certain difficulties that occur to us that the district court may face.

Like King Canute, neither the Congress nor a court can change the forces of nature. "As a class, women live longer than men." *Id.,* at 704, 98 S.Ct. at 1373. Manifestly, an insurance company cannot disregard this fact, any more than it can disregard age, or fail to require premiums and create reserves that will fund its total ultimate obligations in light of the expectancy of its policyholders. Regardless of what one individual woman may do in the way of paying in and taking out, if women in their totality are to take out more than their male coun-

---

**9.** While we believe that the Court's construction of the language of the Equal Pay Act disposes of the issue, we note that the Court also found unpersuasive the interpretation by the Wage and Hour Administrator, 29 C.F.R. § 800.116(d), relied on by the district court, in light of another interpretation of the Administrator, 29 C.F.R. § 800.151 (1976), which condemns wage differentials based on the group-ing of employees by sex for purposes of cost comparisons. *See* 435 U.S. at 714 n.26, 98 S.Ct. 1370. Further, we take note of the fact that the Administrator has proposed to revise, in light of *Manhart,* § 800.116(d), to make "clear . . . that any differential in [employee] benefits based on sex-based actuarial distinctions violates" the Equal Pay Act. *See* 43 Fed.Reg. 38029 (Aug. 25, 1978).

terparts, either they, or someone else, must pay in more. Even though an individual woman may prove to be shortlived, to add her to the group requires a larger premium contribution than if she had been a man.

There would seem, as a matter of mechanics, to be two ways of paying this female supplement. Although *Manhart* was decided below on summary judgment, and the only evidence was an affidavit from an actuary, who stated in part,

"[l]ife expectancy and mortality tables are universal throughout the western commercial world in separating male mortality rates from female mortality rates. . . . To my knowledge, no tables have yet been developed which measure life expectancy for annuity purposes on a unisex basis, . . ."

the thrust of the *Manhart* opinion envisaged a single rate, hereafter unisex rate, of sufficient size to pay for both sexes. The Court found it would be fair that "women as a class . . . be subsidized, to some extent, by the class of male employees." *Id.*, at 708–11, 98 S.Ct. at 1375. If the matter were open, we might have difficulty in seeing how this increased premium for every individual male employee is not based entirely on sex, *viz.*, simply on the presence of female employees. The direct sexual basis would seem emphasized by the only discussion we have found of a theoretical unisex table, which recognized that it would have to be at a variable rate.[10] The Court's conclusion that the subsidy would be fair did not address the issue of its sexual basis,[11] nor the fact that a variable subsidy would upset the widely desired practice of definiteness in pension plans. *See* n.4, ante.

Another aspect not discussed by the Court in contemplating a male subsidy was its effect on plans already agreed to, in that increasing male contributions may constitute a breach of contract. *See, e. g., Abbott v. City of Los Angeles*, 1958, 50 Cal.2d 438, 326 P.2d 484; *Houghton v. City of Long Beach*, 1958, 164 Cal.App.2d 298, 330 P.2d 918; *cf. Hoefel v. Atlas Tack Corp.*, 1 Cir., 1978, 581 F.2d 1. We may wonder whether this would lead to the employer itself having to absorb the difference. In the case of self-insurers, as in *Manhart*, this is a ready if not pleasant solution. If does not, even here, however, avoid other issues raised by unisex rates.

We note, in passing, that the Government-EEOC *Manhart* amicus brief, ante, at 26, perhaps anticipating the difficulties of determining a true unisex rate, asserted that unisex would be "practical for noninsured plans." If this meant that because the cost would automatically be absorbed by the employer, sub silentio, no matter how elastic, it was inapposite to the Court's assumption that the increase would be met by a male subsidy. If it meant that, as a practical matter, the additional employer cost need not be calculated, it could apply, at best, only to the government plans. If a private self-insuring employer does not adequately fund its plan, an ultimate insolvency could be disastrous.

We perceive, a further, two-headed problem. The *Manhart* court stated that "pension benefits, and the contributions that maintain them, are 'compensation' under Title VII." *Id.*, 435 U.S. at 712 n.23, 98 S.Ct. at 1377. If the employer itself makes larger contributions on account of each female employee, this would seem discrimina-

---

**10.** Fellers and Jackson, "Noninsured Pensioner Mortality: The UP–1984 Table," 25 Proceedings, Conference of Actuaries in Public Practice, 456–59, 483–84 (1976), cited in brief for the United States and the EEOC as amici curiae at 24 n.20, & 27 n.24, in *Los Angeles Dep't of Water & Power v. Manhart*, 1978, 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657. If a man whose premium has been (X) should find himself charged (X + W/4) because 25% of his co-employees are women, and (X + W/2) if women rise to 50%, he might ask how such extra deductions in his pay envelope were not based

upon sex, even though it was not his sex, but that of his fellow employees.

**11.** The Court did refer to racial subsidy, at 709 n.15, 98 S.Ct. 1370, but without noting that there are no racial tables, and its references's recital of the fact that at pension ages there is no appreciable life expectancy difference. Brief of the Society of Actuaries, et al., at 11 n.10, in *Los Angeles Dep't of Water & Power v. Manhart*, 1978, 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657.

tory, and impermissible per se. But even if, by calculating a new unisex rate, the supplement is imposed upon the male employees, concededly each female employee ends up with a pension contract that is actuarially worth more than the one received by her male counterpart. In a sense this is not unequal compensation in the individual case because what she receives in dollars will depend upon her actual longevity as distinguished from her actuarial expectancy. We take the essence of *Manhart* to be that, although, to simplify, Title VII, as applied, requires all female employees to be given 12 chances to win $100, and men 10, this is not discriminatory against men because individual women may not realize on their better chances. The perfection of this approach, however, must be measured against the consequences if the plan permitted, as we note in the literature that some do, conversion, or surrender for a lump sum by the employee. In the case at bar the annuity plan does not afford the employee this right, but inequality would seem inescapable if the female employee could obtain a surrender value which, if fairly based on actuarial worth, must exceed her male counterpart's.[12]

Whether, or how, unisex insurer-operated plans can be achieved without revolutionizing the industry we cannot resolve at this stage, and merely flag certain questions that occur to us. Prima facie, *Manhart* compels us to vacate the district court's dismissal of the complaint. However, some of the possible questions, including those adverted to in Chief Judge Coffin's concurrence, seem so serious that, without prejudice, we do not rule that *Manhart* requires a ruling on liability, in order to permit respondents to enlarge the record if they should see fit to do so.

*Reversed and remanded.*

---

**12.** We do not pursue this matter except to note that the solution could not be arbitrarily to provide for the same conversion or surrender value for both sexes. To the extent that, for women, this would be too small, it would be a windfall for the insurer. To the extent that, for men, it would be excessive, men would tend to seek it, resulting in an unfair selection against the company. To forbid plans that permit surrender or conversion altogether would be a radical change, particularly where life insurance is involved. We cannot presently tell whether this would affect the life insurance aspect of the present case.

COFFIN, Chief Judge (concurring).

I concur fully in the court's result and analysis, but I write to express my reservations about the opinion's tangential goal of commenting on problems created for future courts by *Manhart* and this holding. While I agree with the court that *Manhart's* rejection of sex-based actuarial tables extends to our situation, I am not sure that *Manhart* held that an employer could never offer a benefit plan using sex-based tables. To say the same thing another way, I am not sure that every employer-sponsored annuity or life insurance plan must both pay in and pay out the same amount for equally situated men and women. The question of what kind of plan might be legal is not before us.

The plan that is before us, as I see it, fails because it is as if a company paid its male and female employees equal salaries, but in the form of chits that could be redeemed only in a particular store which, the company knew, would give to one sex more for the same number of chits than to the other sex. That company could hardly claim that it was not discriminating between men and women. So here. Perhaps, however, once they turn their attention to the problem, the parties could work out a system permissible under *Manhart* that would eliminate the chit-like nature of the contributions through a set of genuine employee options or other features. If so, perhaps the system could legally include unequal, actuarially sound pension and life insurance benefits for participating men and women. I would not want to foreclose creative approaches to the problem by reading *Manhart* more restrictively than necessary. Therefore, I do not join in the court's comments on *Manhart* to the extent they go beyond the facts of our case. By the same token I do not necessarily share the court's views of the problems it apprehends may lie ahead.