**Cynthia MORGAN, Plaintiff–Appellant,**

v.

**SAFEWAY STORES, INC., and Safeway Arizona Federal Credit Union, Defendants–Appellees.**

No. 88–1785.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 6, 1989.

Decided Sept. 6, 1989.

Grace McIlvain and Dennis P. McLaughlin, Miller & Pitt, Tucson, Ariz., for plaintiff-appellant.

William R. Hayden and Tibor Nagy, Jr., Snell & Wilmer, Phoenix, Ariz., for defendants-appellees.

Susan M. Freeman and Richard S. Cohen, Safeway Arizona Federal Credit Union, Phoenix, Ariz., for defendants-appellees.

Before GOODWIN, Chief Circuit Judge, ALARCON and NELSON, Circuit Judges.

GOODWIN, Chief Circuit Judge:

Cynthia Morgan appeals a summary judgment in favor of her employer, Safeway Stores, Inc. ("Safeway") and her credit union, Safeway Arizona Federal Credit Union ("SAFCU"). She sued both defendants under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–2 (1982), for the discriminatory denial of credit disability benefits.

## I. Background

Safeway is an employer for title VII purposes. It provides its employees traditional compensation and fringe benefits, such as medical insurance and disability programs. In addition, it offers its employees the opportunity to join SAFCU.

SAFCU is a federal credit union organized under 12 U.S.C. §§ 1751–95 (1982 & Supp. IV 1986). To assure that members share a "common bond of occupation or association" or reside in a "well-defined neighborhood, community, or rural district," id. § 1759, an application for a federal credit union charter must contain a proposed "field of membership," id. § 1753. SAFCU listed Safeway and its affiliates as its field of membership. Throughout the period relevant to this action, SAFCU's field of membership consisted only of employees and their families of Safeway and SAFCU. By law, SAFCU's board of directors controls its affairs and, more specifically, establishes its lending policies. See id. § 1761b.

Morgan works for Safeway, and through her employment, is a member of SAFCU. In 1976, Morgan secured a SAFCU loan, and opted for SAFCU's credit disability policy. This policy excludes disability resulting from pregnancy or childbirth. Morgan became pregnant twice, and, pursuant to this policy, twice was denied credit disability benefits, once on May 25, 1979, and then again in April of 1982. Having filed timely charges with the EEOC, and having received a right-to-sue letter from the EEOC, Morgan commenced this title VII action.

Morgan moved for partial summary judgment on three issues: (1) both defen-

dants were "employers" under title VII, (2) the availability of the credit disability insurance policies at issue was a form of "compensation" or a "term, condition or privilege" of employment, and (3) the exclusions in those policies were discriminatory under title VII. Safeway and SAFCU cross-moved for summary judgment. The district court denied Morgan's motion for partial summary judgment and granted defendants' cross-motion for summary judgment on the ground that Safeway had no control over SAFCU's management or personnel decisions generally, or over SAFCU's disability credit insurance policy in particular. This appeal followed.

## II. *Supplementation of the Record*

■ Preliminarily, we dispose of a procedural question. Prior to argument, Morgan moved to supplement the record with newly discovered evidence, namely a Safeway employee magazine distributed in December of 1988. She claims the magazine contains evidence that Safeway provided substantial office support services to SAFCU and an admission by Safeway that SAFCU membership is an employee benefit. We deny the motion for two reasons. First, Morgan has made no showing that the evidence concerning support services is in fact newly discovered. The fact such evidence is contained in a newly discovered publication does not explain why Morgan could not have obtained the same kind of evidence at an earlier date. Second, evidence that Safeway recently described SAFCU membership as an employee benefit is not probative of the degree of Safeway's control or influence over the SAFCU program challenged here. In any case, the purported new evidence does not add to the record. The original papers established that Safeway described SAFCU membership in its handbook as an employee benefit.

## III. *Title VII Claim*

■ In 1978, Congress amended title VII "to prohibit sex discrimination on the basis of pregnancy." Pub.L. 95–555, 92 Stat. 2076 (codified at 42 U.S.C. § 2000e(k)). Thus an employer who treats pregnancy-related conditions less favorably than other medical conditions for purposes of employment benefits violates title VII. *Newport News Shipbuilding & Dry Dock Co. v. EEOC,* 462 U.S. 669, 684, 103 S.Ct. 2622, 2631, 77 L.Ed.2d 89 (1983). Congress, however, has added no similar provision to the Equal Credit Opportunity Act, 15 U.S.C. § 1691 (1982), the act prohibiting discrimination by creditors. Thus Morgan believes her only avenue of relief is title VII. Unfortunately, that title provides no relief here.

Title VII makes it unlawful for an "employer" or an "employment agency" to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. §§ 2000e–2(a) & (b). In this case, the discriminatory policy was offered not by Morgan's employer, Safeway, but by a third party, SAFCU. Standing alone, SAFCU is not an "employer" within the meaning of title VII because it employs fewer than fifteen persons. *See* 42 U.S.C. § 2000e(b). Morgan contends, however, that the entity that discriminated against her was an "employer" within the meaning of title VII, consisting either of (1) the single employing entity composed of Safeway and SAFCU or (2) SAFCU alone which acted as the agent or instrumentality of Safeway.

### A. *Consolidation*

■ This court follows the predominant trend for determining whether businesses should be treated as a single employer for title VII purposes, and applies the four-part test promulgated by the National Labor Relations Board. *See Childs v. Local 18, Int'l Brotherhood of Electrical Workers,* 719 F.2d 1379, 1382 (9th Cir.1983); *see also Baker v. Stuart Broadcasting Co.,* 560 F.2d 389, 392 (8th Cir.1977). Thus this court treats two entities as one if they have (1) interrelated operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership or financial control. *Childs,* 719 F.2d at 1382.

Assuming it is appropriate to apply the *Childs* test in this case, Morgan cannot prevail on a theory of consolidation. To establish common management, Morgan argued that members of SAFCU's board of directors were all Safeway employees. But she does not dispute the assertion that Safeway has no control over SAFCU's selection of board members, and that there are no overlapping directors. To establish centralized control of labor relations, Morgan argued that SAFCU employees are entitled to various insurance policies through Safeway and to profit sharing with Safeway employees. But Morgan presented no evidence disputing the affidavit of SAFCU's president that Safeway has no control over SAFCU's personnel decisions. Finally, Morgan presented no evidence of common ownership or financial control.

Thus Morgan failed to present evidence sufficient to create a genuine issue of material fact whether Safeway and SAFCU should be consolidated for title VII purposes.

## B. *Agency*

Title VII "primarily govern[s] relations between employees and their employer, not between employees and third parties." *City of Los Angeles v. Manhart*, 435 U.S. 702, 718 n. 33, 98 S.Ct. 1370, 1380 n. 33, 55 L.Ed.2d 657 (1978). An employer, however, cannot avoid title VII liability by delegating discriminatory programs to third parties. Title VII specifically applies to "any agent" of a covered employer. *Id.*

The parties dispute the proper construction of "agency" for title VII purposes. Appellees argue that agency under title VII must be tested against the traditional indicia of an agency relationship, namely consent by one person that the other act on its behalf and the understanding that the principal is to control the undertaking. *See*

*Restatement (Second) of Agency* § 1 (1958). Control, they argue, was absent here. Morgan counters that just as courts liberally construe the term "employer" for title VII purposes in order to advance the policy of that title, so too should they liberally construe the term "agent." Thus, she argues, control by the principal is not required; it is sufficient to establish cooperation, participation and interaction between the employer and the third party.

Even if the term "agent" is entitled to a liberal construction, and even if full control by the principal over the discriminatory program is not required, we find no authority to support the construction Morgan would require to prevail.

■ To establish employer responsibility for the discriminatory programs of third parties, the employer must be more than a broker, or other intermediary, that simply enables its employees to enter into arrangements with third parties; the employer must affirmatively, actively participate in the third-party program. *See, e.g., EEOC v. Colby College*, 589 F.2d 1139, 1141 (1st Cir.1978).

Courts basing employer liability on participation in the third-party program have emphasized the fact that the employer had some control over the terms of the program, and thus can be said to have perpetuated the discrimination. For example, in affirming a decision of this court holding an employer vicariously liable for a discriminatory deferred compensation plan administered by a third party, the Supreme Court emphasized the fact that the employer entered into a contract with the third party governing the terms by which the benefits would be provided. *Arizona Governing Committee for Tax Deferred Annuity and Deferred Compensation Plans v. Norris*, 463 U.S. 1073, 1088–91, 103 S.Ct. 3492, 3501–03, 77 L.Ed.2d 1236 (1983).[1] In find-

---

1. Morgan points to this court's opinion in *Norris* to support her view that "participation" does not mean the employer must have taken an active role in the third-party program specifically challenged. *Norris v. Arizona Governing Committee for Tax Deferred Annuity and Deferred Compensation Plans*, 671 F.2d 330 (9th Cir.1982). Our opinion in *Norris*, however, does not support

this view. In *Norris*, we noted Arizona could not successfully distinguish cases holding employers vicariously liable for third-party programs on the basis that the employers in those cases took an active role in administering or developing the program, because given the facts in *Norris*, Arizona's adoption of the plan constituted active participation in that plan. *Id.* at

ing an employer could be held liable for a similar discriminatory program, the First Circuit emphasized the fact that though a third party administered the program, premiums were determined by a formula established by the employer based on salary and position, and participation in the program was made mandatory by the employer. *EEOC v. Colby College*, 589 F.2d at 1141; *see also Spirt v. Teachers Insurance & Annuity Association*, 475 F.Supp. 1298, 1308 n. 16 (S.D.N.Y.1979) (same), *aff'd in part, rev'd in part on other grounds*, 691 F.2d 1054 (2d Cir.1982), *cert. granted and judgment vacated*, 463 U.S. 1223, 103 S.Ct. 3565, 77 L.Ed.2d 1406 (1983), *on remand, judgment reinstated with modification on other ground*, 735 F.2d 23 (2d Cir.), *cert. denied*, 469 U.S. 881, 105 S.Ct. 247, 83 L.Ed.2d 185 (1984). Finally, in stating that a parent corporation would have been vicariously liable for the discriminatory employment practices of a subsidiary, had it not been liable in its own right, the middle district of North Carolina noted that the parent and subsidiary shared a hiring office and coordinated employment policies. *Hairston v. McLean Trucking Co.*, 62 F.R.D. 642, 663 (M.D.N.C.1974), *vacated and remanded for further relief to plaintiffs*, 520 F.2d 226 (4th Cir.1975). Moreover, because the parent applied the companies' mutual no-rehire and no-transfer policies to employees of the subsidiary, it perpetuated the discrimination practiced by the subsidiary of which it had knowledge. *Id.* at 662–63. *Cf. also Crowder v. Fieldcrest Mills, Inc.*, 569 F.Supp. 825, 827 (M.D.N.C.1983) (insurance company that served as adviser to employer in latter's administration of health insurance program but who exercised no control over employer's insurance program not liable as agent of employer).

■ To support her argument that Safeway "participated" in SAFCU's discriminatory program, Morgan notes that Safeway sponsored SAFCU; Safeway promoted membership in SAFCU by offering such membership to its employees and their families; Safeway included SAFCU membership applications in its hiring handbook and listed SAFCU membership as a "benefit;" Safeway provided SAFCU with the benefits of a payroll deduction program for loan payments; Safeway provided SAFCU employees with the benefits of its own employee benefit programs; Safeway shared its interoffice mail system with SAFCU; Safeway knew that SAFCU offered credit disability insurance, and at least by 1979 when Morgan filed her first charge of discrimination, knew that SAFCU offered that insurance on a discriminatory basis.

Absent from the above facts is evidence of participation by Safeway in establishing or maintaining SAFCU's credit disability policy. Safeway did not specify the terms of that program by contract, *see Norris, supra;* it did not require its employees to secure credit disability insurance, *see Spirt, supra; Colby College, supra;* it did not establish any conditions for receiving SAFCU benefits, *see id.;* and it did not develop the terms of SAFCU's program in coordination with SAFCU, *see Hairston, supra.* By including applications in its handbook, Safeway no doubt facilitated membership in SAFCU, but such facilitation is insufficient to hold Safeway legally responsible for the terms of SAFCU's lending policies. By furnishing an interoffice mail system, Safeway facilitated to some degree the general operations of SAFCU, but such faciliation falls far short of active participation in the challenged program. Further, payroll deductions by employers to facilitate employee payments are common, but do not prove that the employer has or exercises any influence over the policy of the payee. Finally, even if we agreed that economic leverage over a credit union could constitute the necessary control for purposes of agency under title VII, the fact that Safeway sponsored SAFCU and supplied some support services would not justify a trier of fact in finding that after its launching by Safeway, SAF-

334. Those facts included entering into a contract governing the terms of the plan. Thus no matter who developed the terms, Arizona specif-

ically agreed to those terms by contract. Such active participation is absent here.

CU would have collapsed if Safeway had withdrawn its sponsorship.

We therefore conclude the district court correctly found SAFCU was not the agent of Safeway for title VII purposes.

AFFIRMED.

NELSON, Circuit Judge, dissenting:

I dissent because I believe that an employer cannot escape the reach of Title VII by delegating its responsibility for the evenhanded provision of fringe benefits to a third party whom the employer knows will discriminate on the basis of pregnancy. I find this case particularly troubling in light of the substantial overlap in operations between Safeway and SAFCU.

Although I agree with the majority's conclusion that the overlap between Safeway and SAFCU is insufficient to satisfy the "single employer" test set forth in *Childs*, that test does not govern Morgan's action against Safeway. In *Childs*, the plaintiff attempted to hold the international union liable for an alleged discriminatory firing by the local union of the local's own employee. *Childs v. Local 18, International Brotherhood of Electrical Workers*, 719 F.2d 1379 (9th Cir.1983). The court adopted the "single employer" test formulated by the NLRB to determine whether to hold the international responsible for the local's labor policies on the ground that the local was the alter ego of the international. *See id.* at 1382; *see also Baker v. Stuart Broadcasting Co.*, 560 F.2d 389 (8th Cir. 1977) (adopting the single employer test to determine whether the radio station's licenseholder and the licenseholder's provider of management services were liable for the station's alleged discrimination in hiring).

In this case, in contrast, Morgan does not seek to hold Safeway liable for SAFCU's employment policies vis a vis SAFCU's own employees. Rather, Morgan argues that Safeway is liable for the manner in which SAFCU provides fringe benefits promised by Safeway to Safeway employees. When an employer delegates responsibility for the provision of a fringe benefit to a third

party, liability does not turn on the alter ego or single employer analysis. *See Norris*, 463 U.S. 1073, 1089, 103 S.Ct. 3492, 3501, 77 L.Ed.2d 1236 (1983) ("Since employers are ultimately responsible for the 'compensation, terms, conditions, [and] privileges of employment' provided to employees, an employer that adopts a fringe-benefit scheme that discriminates among its employees on the basis of race, religion, sex, or national origin violates Title VII regardless of whether third parties are also involved in the discrimination."); *Norris v. Arizona Governing Committee for Tax Deferred Annuity and Deferred Compensation Plans*, 671 F.2d 330, 334 (9th Cir. 1982), *aff'd in part, rev'd in part*, 463 U.S. 1073, 103 S.Ct. 3492, 77 L.Ed.2d 1236 (1983) (holding that when an employer adopts a fringe benefit plan, "[t]he fact that the plan is operated by a private insurance company rather than Arizona does not render [relevant Title VII authority] less controlling."); *Spirt v. Teachers Insurance and Annuity Association*, 475 F.Supp. 1298, 1308 (S.D.N.Y.1979) ("Educational institutions such as LIU have delegated their responsibility for and control over employee annuity plans to TIAA and CREF. To hold that discrimination in that aspect of employee compensation cannot be fully remedied under Title VII because of such delegation would impair the effectiveness of the Act."), *aff'd in part, rev'd in part on other grounds*, 691 F.2d 1054 (2d Cir. 1983), *cert. granted and judgment vacated*, 463 U.S. 1223, 103 S.Ct. 3565, 77 L.Ed.2d 1406 (1983), *on remand, judgment reinstated with modification on other ground*, 735 F.2d 23 (2d Cir.), *cert. denied*, 469 U.S. 881, 105 S.Ct. 247, 83 L.Ed.2d 185 (1984).

In the area of delegated fringe benefits, courts have evaluated the extent of the employer's "participation" in the discriminatory program on a continuum in order to determine liability. At one end of the continuum lies the employer who merely acts as a broker or intermediary, enabling its employees to enter into third party arrangements. *See EEOC v. Colby College*, 589 F.2d 1139, 1141 (1st Cir.1978); *see also City of Los Angeles v. Manhart*, 435 U.S.

702, 717, 98 S.Ct. 1370, 1380, 55 L.Ed.2d 657 ("Nothing in our holding implies that it would be unlawful for an employer to set aside equal retirement contributions for each employee and let each retiree purchase the largest benefit which his or her accumulated contributions could command in the open market."). At the other end of the continuum is the employer who actively participates in the provision of mandatory discriminatory benefits by knowingly contracting with a third party for the provision of benefits in a discriminatory manner. *See, e.g., Arizona Governing Committee for Tax Deferred Annuity & Deferred Compensation Plans v. Norris,* 463 U.S. 1073, 1088–89, 103 S.Ct. 3492, 3501–02, 77 L.Ed.2d 1236 (1983) ("Having created a plan whereby employees can obtain the advantages of using deferred compensation to purchase an annuity only if they invest in one of the companies specifically selected by the state, the state cannot disclaim responsibility for the discriminatory features of the insurers' options".)

Safeway's sponsorship of SAFCU in providing fringe benefits for Safeway's employees and its active promotion of membership in the credit union even after it became aware of SAFCU's discriminatory credit disability program places Safeway's participation in SAFCU's program in the area of the continuum in which liability attaches.

Safeway acted as much more than a mere broker or intermediary between its employees and SAFCU. Safeway essentially caused SAFCU to come into being in order to provide financial services to Safeway's employees. At the time of the discrimination, Safeway was SAFCU's only sponsor and the membership of SAFCU consisted solely of current and former Safeway employees and their families. Without Safeway's continued support, SAFCU probably would have ceased to exist. *See Colby College,* 589 F.2d at 1141 (citing as support for its finding that the university was more than a broker or intermediary the fact that "an educational institution's adoption of [an insurance association] 'constitutes affirmative active participation,' without which 'the challenged pro-

gram could not operate,' " *citing Spirt v. Teachers Insurance and Annuity Association of America,* 416 F.Supp. 1019, 1021–22 (S.D.N.Y.1976)).

Safeway affirmatively and actively promoted the credit union. It encouraged membership in SAFCU by listing SAFCU membership as a benefit of Safeway employment, including SAFCU membership applications in its hiring handbook, allowing SAFCU to use its interoffice mail system, and arranging for presentations by SAFCU representatives to discuss the benefits of SAFCU membership. Safeway facilitated the discriminatory credit disability policy in particular by providing employees with the option of direct payroll deductions for their disability insurance payments and for their payments on the loans that the credit disability program insured. *Cf. Norris,* 463 U.S. at 1077, 103 S.Ct. at 3495 ("The State bears the cost of making the necessary payroll deductions and of giving employees time off to attend group meetings to learn about the plan....")

Most importantly, Safeway continued to sponsor SAFCU and to provide its employees with benefits through SAFCU even after Safeway became aware of the credit disability policy's discriminatory terms. Safeway's sponsorship and promotion of SAFCU despite its knowledge of the discriminatory terms render Safeway as culpable for discrimination as an employer who contracts with a third party for the provision of benefits on a discriminatory basis. The majority opinion attempts to distinguish Safeway's conduct from that of a "contracting employer" on the ground that Safeway lacks control over the terms of the discriminatory program. Yet Safeway has the same "control" over the discriminatory program as would a contracting employer; just as a dissatisfied contracting employer may select a different supplier of the benefit program, Safeway may refuse to do business with SAFCU unless the discriminatory terms are deleted. In fact, as SAFCU's only sponsor, Safeway has even more control over SAFCU than would an ordinary contracting employer because a revocation of sponsorship

would jeopardize SAFCU's very existence. For this reason I cannot concur in an opinion holding that Title VII liability turns on an employer's "actual" control over the fringe benefit program.

I also cannot join an opinion that hinges liability on whether the employer was a party to a contract that included discriminatory terms. This reasoning allows a delegating employer to hide behind intentionally broad contractual language. Unlike the use of gender specific actuarial tables, most types of discrimination will not be readily apparent from the terms of the contract.

The linchpin of liability should be the employer's awareness that the third party is administering the program on a discriminatory basis. At that point, the employer's continued promotion and sponsorship of the program constitutes ratification of the discriminatory conduct. This court should reverse and remand this case to the district court for further proceedings to determine the extent of Safeway's knowledge of the discriminatory credit disability program.