Diana L. SPIRT, Plaintiff,

v.

TEACHERS INSURANCE AND ANNUI-
TY ASSOCIATION, College Retirement
Equities Fund, and Long Island Univer-
sity, Defendants.

No. 74 Civ. 1674.

United States District Court,
S. D. New York.

Aug. 9, 1979.

On Motion for Reargument Sept. 12, 1979.

Kenneth D. Wallace, New York City, for plaintiff Diana L. Spirt.

Rogers & Wells, New York City, for defendants Teachers Ins. and Annuity Ass'n and College Retirement Equities Fund; William R. Glendon, James B. Weidner, James W. Paul, New York City, of counsel.

Francis A. McGrath, Brooklyn, N. Y., for defendant Long Island University.

Judith E. Tytel, Muttontown N. Y., Attorney for Defendant Long Island University.

## OPINION

WARD, District Judge.

This is an action alleging sex discrimination in the operation of certain retirement annuity programs administered by defendants Teachers Insurance and Annuity Association ("TIAA") and College Retirement Equities Fund ("CREF"). Plaintiff Diana L. Spirt ("Spirt"), a college professor who is required by her employer, defendant Long Island University ("LIU"), to participate in the TIAA and CREF plans, has moved for summary judgment, pursuant to Rule 56, Fed.R.Civ.P., alleging that the retirement annuity plans in question violate both the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., ("Title VII" or "the Act") and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Defendants TIAA and CREF have cross-moved for summary judgment.[1] For the reasons hereinafter stated, Spirt's motion is granted in part and denied in part; TIAA and CREF's cross-motion is granted as to TIAA and denied as to CREF.

The parties have submitted a detailed Stipulation of Facts which indicates the following: TIAA is a non-profit, legal reserve life insurance company, organized in 1918 by the Carnegie Foundation for the Advancement of Teaching. It functions as a service organization, providing retirement and insurance plans for educational institutions and their staff members. Eligibility is limited to colleges, universities, indepen-dent schools, and certain other non-profit institutions that are engaged primarily in education or research. CREF is a companion non-profit corporation to TIAA with the same limited eligibility. The purpose of both TIAA and CREF is to offer educational institutions retirement and other benefit plans suited to the needs of their teaching staffs and other employees. The essential difference between the two corporations is that TIAA provides fixed dollar annuities, while CREF provides variable annuities.[2] Over 85 percent of all private four-year colleges and universities and over 40 percent of all public colleges and universities have adopted retirement plans managed by TIAA and CREF. In all, more than 450,000 employees of approximately 2,800 participating institutions are insured by the TIAA and CREF system.

LIU is one of the institutions which has adopted a retirement program for its employees managed by TIAA and CREF. Pursuant to a resolution of LIU's Board of Trustees, both the employee and the university contribute 5 percent of the first $4,800 of earnings; thereafter, the employee's contribution remains at 5 percent, and the institution contributes 11 percent. Participation in the plans by tenured professors at LIU, such as Spirt, is mandatory.

Plaintiff's claim of sex discrimination does not rest upon the contribution formula under the TIAA and CREF plans, which is identical for men and women. Rather, the asserted discrimination derives from TIAA and CREF's use of sex-segregated mortality tables in determining the benefits purchased with the contributions. These tables reflect the fact, that, taken as a group or class, women have a greater life expectancy than men. Based upon the uncontested rationale that women as a class will receive annuity payments for a longer period of time than men as a class, female participants in the plans receive smaller monthly payments than male participants of the same age, years in in the plans, salary, and

1. Defendant LIU joins in neither motion. Rather, it "avers that it has always acted in good faith towards its male and female employees . . . .," adopts a position of neutrality with respect to the issues before the Court, and "submits its rights and interests to the protection of [the] [C]ourt . . . ."

2. See footnote 4 infra.

rate of contribution. Spirt contends that this discrimination violates Title VII and/or the Equal Protection Clause.

## I. *Title VII*

### A. The McCarran-Ferguson Act

TIAA and CREF first assert that application of Title VII to them in this case is barred by the McCarran-Ferguson Act ("the McCarran Act"), 15 U.S.C. § 1011 *et seq.*, which provides in pertinent part:

> No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance . . .

*Id.* § 1012(b).

The McCarran Act was passed in response to the Supreme Court's decision in *United States v. South-Eastern Underwriters Ass'n*, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944), which, overruling *Paul v. Virginia*, 8 Wall. 168, 75 U.S. 168, 183, 19 L.Ed. 357 (1869), held that insurance transactions were subject to federal regulation under the Commerce Clause. The purpose of the statute was "broadly to give support to the existing and future state systems for regulating and taxing the business of insurance . . . by removing obstructions which might be thought to flow from [congressional] power" and by declaring continued state regulation of the business of insurance to be in the public interest.[3] *Prudential Ins. Co. v. Benjamin*, 328 U.S. 408, 429–30, 66 S.Ct. 1142, 1155, 90 L.Ed. 1342 (1946); *accord, SEC v. National Securities, Inc.*, 393 U.S. 453, 458, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969). The effect of the legislation was to make federal statutes inapplicable to the business of insurance, returning to the states the plenary regulatory power they had enjoyed prior to the *South-Eastern Underwriters* decision, unless (1) federal legislation specifically related to the business of insurance; or (2) the challenged

activity by the defendant did not constitute the business of insurance; or (3) the state had not enacted any law for the purpose of regulating the business of insurance which would be invalidated, impaired, or superseded by application of the federal law. *Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 218, 99 S.Ct. 1067, 1076 & nn. 16, 18, 59 L.Ed.2d 261 (1979); *SEC v. National Securities, Inc., supra,* 393 U.S. at 458–61, 89 S.Ct. 564; *Prudential Ins. Co. v. Benjamin, supra,* 328 U.S. at 429–30, 66 S.Ct. 1142; *Cochran v. Paco,* 606 F.2d 460, ·464 (5th Cir. 1979); *Hamilton Life Ins. Co. v. Republic Nat'l Life Ins. Co.,* 408 F.2d 606, 611 (2d Cir. 1969); *Monarch Life Ins. Co. v. Loyal Protective Life Ins. Co.,* 326 F.2d 841, 844 (2d Cir. 1963), *cert. denied,* 376 U.S. 952, 84 S.Ct. 968, 11 L.Ed.2d 971 (1964).

■ Federal legislation is deemed to "specifically relate to the business of insurance" within the meaning of the McCarran Act only if it contains an express indication to that effect. *Prudential Ins. Co. v. Benjamin, supra,* 328 U.S. at 429–30, 66 S.Ct. at 1155; *Cochran v. Paco, supra,* 606 F.2d at 464–465; *Hamilton Life Ins. Co. v. Republic Nat'l Life Ins. Co.,* 291 F.Supp. 225, 230 (S.D.N.Y.1968), *aff'd,* 408 F.2d 606, 611 (2d Cir. 1969); *Ben v. General Motors Acceptance Corp.,* 374 F.Supp. 1199, 1201 (D.Colo. 1974); *Gerlach v. Allstate Ins. Co.,* 338 F.Supp. 642, 649 (S.D.Fla.1972). The federal statute relied on here, Title VII, is a law of general applicability to employers in commerce with no explicit reference to insurance. *Compare* § 514(a) of ERISA, 29 U.S.C. § 1144(a), *discussed in Hewlett-Packard Co. v. Barnes,* 571 F.2d 502 (9th Cir.), *cert. denied,* 439 U.S. 831, 99 S.Ct. 108, 58 L.Ed.2d 125 (1978). Thus, the supremacy of state regulation of the TIAA and CREF plans cannot be overridden on this basis.

■ The next consideration under McCarran Act analysis is whether the activities of defendants challenged by plaintiff constitute the "business of insurance." Al-

---

**3.** In this regard, the statute contains the following "declaration of policy":

Congress declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States.

15 U.S.C. § 1011.

though neither Congress nor the courts has defined the exact contours of the term, the general parameters were set by the Supreme Court in *SEC v. National Securities, Inc.,* 393 U.S. 453, 459–60, 89 S.Ct. 564, 569, 21 L.Ed.2d 668 (1969):

Insurance companies may do many things which are subject to paramount federal regulation; only when they are engaged in the "business of insurance" does the statute apply. Certainly the fixing of rates is part of this business; that is what *South-Eastern Underwriters* was all about. The selling and advertising of policies, *FTC v. National Casualty Co.,* 357 U.S. 560, 78 S.Ct. 1260, 2 L.Ed.2d 1540 (1958), and the licensing of companies and their agents, cf. *Robertson v. California,* 328 U.S. 440, 66 S.Ct. 1160, 90 L.Ed. 1366 (1946), are also within the scope of the statute. Congress was concerned with the type of state regulation that centers around the contract of insurance, the transaction which *Paul v. Virginia* held was not "commerce." The relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement—these were the core of the "business of insurance." Undoubtedly, other activities of insurance companies relate so closely to their status as reliable insurers that

they too must be placed in the same class. But whatever the exact scope of the statutory term, it is clear where the focus was—it was on the relationship between the insurance company and the policyholder. Statutes aimed at protecting or regulating this relationship, directly or indirectly, are laws regulating the "business of insurance."

The activity challenged in the instant case—the use of sex-segregated mortality tables in the computation of annuity benefits—is an integral part of the relationship between the insurance company and the policyholder and specifically centers on the type of policy which can be issued. As such, it would appear to fall squarely within the "business of insurance" as defined by *National Securities.*

However, the Supreme Court has also interpreted the word "insurance" under the McCarran Act to require some *investment* risk-taking on the part of the insurance company. *SEC v. Variable Annuity Co.,* 359 U.S. 65, 79 S.Ct. 618, 3 L.Ed.2d 640 (1959); *accord, Group Life & Health Ins. Co. v. Royal Drug Co., supra,* 99 S.Ct. at 1073–74. Thus, the Court has held that variable annuity companies, which assume only the risk of mortality but no investment risk[4] do not issue insurance within the

---

4. The Supreme Court has compared a variable annuity to the traditional fixed annuity as follows:

While all the States regulate "annuities" under their "insurance" laws, traditionally and customarily they have been fixed annuities, offering the annuitant specified and definite amounts beginning with a certain year of his or her life. The standards for investment of funds underlying these annuities have been conservative. The variable annuity introduced two new features. First, premiums collected are invested to a greater degree in common stocks and other equities. Second, benefit payments vary with the success of the investment policy. The first variable annuity apparently appeared in this country about 1952 when New York created the College Retirement Equities Fund to provide annuities for teachers. It came into existence as a result of a search for a device that would avoid paying annuitants in depreciated dollars. The theory was that returns from investments in common stocks would over the long run tend to compensate for the mounting inflation. The holder of a variable annuity can-

not look forward to a fixed monthly or yearly amount in his advancing years. It may be greater or less, depending on the wisdom of the investment policy. In some respects the variable annuity has the characteristics of the fixed and conventional annuity: payments are made periodically; they continue until the annuitant's death or in case other options are chosen until the end of a fixed term or until the death of the last of two persons; payments are made both from principal and income; and the amounts vary according to age and sex of the annuitant. Moreover, actuarially both the fixed-dollar annuity and the variable annuity are calculated by identical principles. Each issuer assumes the risk of mortality from the moment the contract is issued. That risk is an actuarial prognostication that a certain number of annuitants will survive to specified ages. Even if a substantial number live beyond their predicted demise, the company issuing the annuity—whether it be fixed or variable—is obligated to make the annuity payments on the basis of the mortality prediction reflected in the contract. This is the mortality risk assumed

meaning of the Act. *SEC v. Variable Annuity Co., supra,* 359 U.S. at 69–73, 79 S.Ct. 618. While TIAA offers fixed annuities which subject it to investment risk, CREF is a variable annuity company.[5] Under the rationale of *SEC v. Variable Annuity Co.,* therefore, it cannot be exempted from the dictates of Title VII as a result of state regulation of its policies. Consequently, the Court rejects this ground of CREF's motion for summary judgment.

▮ Having met the first two conditions for supremacy of state regulation of the business of insurance, TIAA must still demonstrate that New York State has enacted a law for the purpose of regulating the business of insurance which would be invalidated, impaired, or superseded by the application of Title VII in the instant case. Plaintiff argues that New York State has not regulated the question before the Court. The McCarran Act does not specify the extent to which a state must have regulated the business of insurance before application of a federal statute will be deemed to "invalidate, impair, or supersede" state law. However, this language has been judicially construed as satisfied whenever the state has either occupied the field of regulating the business of insurance or else has regulated the same general subject within the business of insurance as that potentially affected by the federal statute. *See Lowe v. Aarco-American, Inc.,* 536 F.2d 1160, 1162 (7th Cir. 1976); *Cochran v. Paco, Inc.,* 409 F.Supp. 219, 222 (N.D.Ga.1975), *rev'd on other grounds,* 606 F.2d 460 (5th Cir. 1979); *Ben v. General Motors Acceptance Corp., supra,* 374 F.Supp. at 1201; *Ger-*

*lach v. Allstate Ins. Co., supra,* 338 F.Supp. at 649–50.[6] This interpretation is supported by the legislative intent that, except as otherwise expressly provided, plenary power to regulate the business of insurance rests in the states. *SEC v. National Securities, Inc., supra,* 393 U.S. at 459–60, 89 S.Ct. 564; *Prudential Ins. Co. v. Benjamin, supra,* 328 U.S. at 429–30, 66 S.Ct. 1142; *Cochran v. Paco, Inc., supra,* 606 F.2d at 462–464.

In the instant case, New York has occupied the field of regulating the business of insurance through one of the most comprehensive insurance codes in the country. It has also pervasively regulated the subject of discrimination between policyholders. For example, § 209 of the Insurance Law provides *inter alia* that no life insurance company doing business in the state shall make or permit any unfair discrimination between individuals of the same class and of equal expectation of life in premiums, rates, dividends or benefits of policies for life insurance or annuities. The restriction of § 209's proscription to discrimination between individuals of the same class evidences a legislative acceptance of discrimination between individuals based on their membership in classes or groups which, from an actuarial point of view, are known to present different insurance risks. Indeed, such risk classification is a concept fundamental to the operation of insurance systems. *The Supreme Court, 1977 Term,* 92 Harv.L.Rev. 57, 302 (1978); Note, *Sex Discrimination and Sex-Based Mortality Tables,* 53 B.U.L.Rev. 624, 625–26 & nn. 9–10,

---

both by [issuers of variable annuities] and by those who issue fixed annuities.
*SEC v. Variable Annuity Co., supra,* 359 U.S. at 69–70, 79 S.Ct. at 621, (footnotes omitted).

**5.** In fact, the Supreme Court in *SEC v. Variable Annuity, supra,* makes explicit reference to CREF as the provider of the first variable annuity plan in the United States. 359 U.S. at 69, 79 S.Ct. 618, *quoted* in footnote 4 *supra.*

**6.** This interpretation parallels that accorded the antitrust proviso to the statute which states that the Sherman Act, the Clayton Act and the Federal Trade Commission Act "shall be applicable to the business of insurance to the extent that such business is not regulated by State

law." 15 U.S.C. § 1012(b). *See FTC v. National Casualty Co.,* 357 U.S. 560, 564–65, 78 S.Ct. 1260, 2 L.Ed.2d 1540 (1958); *Crawford v. American Title Ins. Co.* 518 F.2d 217, 218–19 (5th Cir. 1975) (per curiam); *Commander Leasing Co. v. Transamerica Title Ins. Co.,* 477 F.2d 77, 83–84, 86 (10th Cir. 1973); *California League of Independent Ins. Producers v. Aetna Casualty & Surety Co.,* 175 F.Supp. 857, 860 (N.D.Cal.1959). Although cases construing the antitrust proviso are not dispositive of the issues presently before this Court, "they do serve as useful guides for construing the terms of the statute." *Cochran v. Paco, Inc., supra,* 606 F.2d at 463–464.

627 n.18, 653–54 (1973). Since defendants' use of sex-segregated mortality tables is based on the demonstrated difference in longevity between men as a class and women as a class, it is the type of discrimination contemplated by New York's regulatory scheme. Consequently, application of Title VII to enjoin the use of such tables by TIAA would invalidate, impair, or supersede New York law.

Other provisions of the New York Insurance Law not only regulate the subject of discrimination between policyholders, but also evidence a legislative belief that discrimination on the basis of sex in the rates and benefits of annuity contracts is not unlawful. For example, implicit in §§ 159(1)(d) and 160(c), which refer to remedies for misstatements of age and sex in annuity contracts, is the notion that New York views sex as a permissible factor in setting annuity rates and benefits. The same conclusion is suggested by a comparison of § 40(10) with § 40–e. The former section contains a sweeping prohibition of discrimination in "any . . . manner whatsoever" on account of race, color, creed, or national origin. By contrast, sex discrimination is subject to a separate, limited prohibition in § 40–e, which makes it unlawful for an insurer to refuse to issue or to cancel or decline to renew a policy on account of the sex of the applicant. *See January 28, 1975 Opinion and Report Pursuant to Section 278 of the Insurance Law;* *News Memorandum re Chapter 564, issued by the Executive Chamber of the State of New York, August 4, 1975.*

The Court is persuaded on the basis of this evidence that New York State has regulated the business of insurance, including the subject of discrimination between policyholders, in a pervasive manner and that, within that comprehensive system of regulation, discrimination on the basis of sex in computing rates and benefits is considered to be permissible. Consequently, application of Title VII to TIAA in the instant case would invalidate, impair, or supersede New York law regulating the business of insurance. Accordingly, the Court holds that application of Title VII to TIAA in this case is precluded by the McCarran Act.[7]

B. Title VII Procedural Prerequisites

TIAA[8] and CREF make the additional preliminary argument that plaintiff's Title VII claim must be dismissed because she has failed to comply with the statute's elaborate procedural requirements. Among the jurisdictional prerequisites to the maintenance of a civil action under Title VII is that the grievant have filed timely charges of employment discrimination with the Equal Employment Opportunity Commission ("EEOC") and received from that agency a statutory notice of the right to sue. 42 U.S.C. § 2000e–5(a), (e), (f); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 798, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Silver v. Mohasco Corp.,* 602 F.2d

---

**7.** Spirt's additional arguments as to the inapplicability of the McCarran Act border on the frivolous. The Court finds nothing in *SEC v. Variable Annuity Co., supra,* or *Group Life & Health Ins. Co. v. Royal Drug Co., supra,* which supports plaintiff's argument that the McCarran Act's immunity from federal legislation applies only to such state regulation as was in existence at the time of the grant. Moreover, the Supreme Court's statement in *Prudential Ins. Co. v. Benjamin, supra,* that "Congress' purpose was broadly to give support to the existing *and future* state systems for regulating and taxing the business of insurance," 328 U.S. at 429, 66 S.Ct. at 1155 (emphasis added), makes clear that Spirt's interpretation of the case law construing the statute is erroneous. In any event, the Court believes that New York's regulation of insurance at the time the McCarran Act became effective was such as to be invalidated, impaired, or superseded by application of Title VII herein. Sections 159, 160 and 209, for example, were enacted in 1939, six years prior to the passage of the McCarran Act.

Plaintiff has also argued that the McCarran Act is an antitrust exemption statute, and that other newly enacted federal statutes preempt state statutory regulation of insurance unless the federal statute provides otherwise. The Court finds nothing in *Insurers' Action Council, Inc. v. Heaton,* 423 F.Supp. 921 (D.Minn.1976), or *Lowe v. Aarco-American, Inc.,* 536 F.2d 1160 (7th Cir. 1976), cited by plaintiff or elsewhere which supports this view.

**8.** Although the Court has held that the McCarran Act bars application of Title VII to TIAA, it has indicated throughout this opinion additional arguments made by that defendant, since TIAA has argued for summary judgment on behalf of CREF as well as on its own behalf.

1083, 1085–1086 (2d Cir. 1979); *Weise v. Syracuse University*, 522 F.2d 397, 412 (2d Cir. 1975). When the alleged unlawful employment practice occurs within a state having a law prohibiting such a practice, an aggrieved person must also preliminarily seek relief from the relevant state authority. The EEOC may not act upon the charge until 60 days after state proceedings have been commenced, unless state proceedings have been terminated earlier. 42 U.S.C. § 2000e–5(c); *Love v. Pullman Co.*, 404 U.S. 522, 524–25, 92 S.Ct. 616, 30 L.Ed.2d 679 (1972); *Silver v. Mohasco Corp.*, supra, 602 F.2d at 1085–1086; *Weise v. Syracuse University, supra*, 522 F.2d at 411.

In the instant case, Spirt filed her complaint commencing this action on April 14, 1974, prior to filing charges with either the EEOC or the New York State Division of Human Rights ("NYSDHR"), the state agency responsible for complaints alleging discrimination in employment on the basis of sex.[9] On October 25, 1974, she submitted a charge to the EEOC. By letter dated November 6, 1974, the EEOC informed plaintiff that her complaint had been forwarded to the NYSDHR and asked plaintiff to "contact [the state agency] immediately to be certain that all requirements for commencing proceeding in your case have been met." A week later, by letter dated November 13, 1974, a Supervisor at the NYSDHR wrote to Spirt, confirming that her charge had been referred to that agency by the EEOC. In the letter, the Supervisor indicated that he had tried unsuccessfully to call Spirt and her attorney and asked that Spirt call him since, before he could proceed, he needed answers to several questions posed by her charge to the EEOC. Nevertheless, allegedly due at first to substantial delays in receipt of the letter and then to the Supervisor's failure to return Spirt's attorney's calls, the sixty day deferral period expired without either Spirt or her attorney's ever establishing communication with the Supervisor at the NYSDHR. Once the deferral period had elapsed, Spirt's attorney, believing that the procedural requirements of the statute had been satisfied, made no further efforts to contact the state agency. The EEOC also believed the deferral requirement satisfied after 60 days and as of that time considered Spirt's charge to have been formally filed with it. When 180 days passed after the date of formal filing without a disposition of Spirt's charge by the EEOC, her attorney requested and received from that agency a Right to Sue letter, closing the EEOC file and entitling Spirt to maintain a lawsuit on the charge. Upon receipt of the Right to Sue letter, plaintiff proceeded with the instant action.

TIAA and CREF argue that the jurisdictional prerequisites to the maintenance of this action have not been satisfied because Spirt commenced this lawsuit without recourse to either the EEOC or the NYSDHR. Defendants assert that this action is also jurisdictionally defective because plaintiff's attorney's delayed response to the November 13, 1974 letter deprived the NYSDHR of a bona fide opportunity to consider and act upon her complaint.

The first of these arguments has already been rejected by this Court in a prior opinion. *Spirt v. TIAA*, 416 F.Supp. 1019, 1020 (S.D.N.Y.1976).[10] The recent de-

---

**9.** The applicable statute is New York's Human Rights Law, Executive Law § 290 *et seq.* (McKinney 1972 & 1978 Supp.).

**10.** This Court's conclusion recently received additional support in *Oscar Mayer & Co. v. Evans,* —— U.S. ——, 99 S.Ct. 2066, 60 L.Ed.2d 609 (1979). There the Supreme Court ordered the federal district court to retain jurisdiction, holding the suit in abeyance, pending plaintiff's resort to the state agency. *Id.* 99 S.Ct. at 2076. The Court stated: "Suspension of proceedings is preferable to dismissal with leave to refile. . . . 'To require a second "filing" by the aggrieved party after termination of state proceedings would serve no purpose other than the creation of an additional procedural technicality. Such technicalities are particularly inappropriate in a statutory scheme in which laymen, unassisted by trained lawyers, initiate the process.' *Love v. Pullman Co.*, 404 U.S. 522, 526–527, 92 S.Ct. 616, 30 L.Ed.2d 679 (1972) . . . . For this reason, suspension pending deferral is the preferred practice in the federal courts." 99 S.Ct. at 2076 n. 13 (citations omitted).

cision by the United States Supreme Court in *Oscar Mayer & Co. v. Evans,* —— U.S. ——, 99 S.Ct. 2066, 60 L.Ed.2d 609 (1979), has made it clear beyond peradventure that defendants' second argument as to jurisdiction is also without merit. Indicating that the virtually identical language of § 14(b) of the Age Discrimination in Employment Act, 29 U.S.C. § 633(b) and § 706(b) of Title VII, 42 U.S.C. § 2000e–5(c), requiring a sixty-day period of deferral to state authorities were to be construed *in pari materia,* 99 S.Ct. at 2071, the Court interpreted the burden on the grievant under those sections as limited to the commencement of state proceedings by the filing of a written and signed statement of the facts upon which the proceeding is based. *Id.* at 2073–76. The Court recognized that such a statutory construction could conceivably permit grievants to avoid state intervention by failing to comply with state-imposed requirements, thereby frustrating the congressional intent that federal litigation be used as a last resort. *Id.* at 2075. Nevertheless, it interpreted the statutory language, which relates the proscription of further action only to the *commencement* of state proceedings [11] and which specifically excludes state-imposed requirements other than the filing of a written and signed statement of the facts from the definition of "commencement," [12] as indicative of a congressional intent that the failure to meet additional state procedural requirements not foreclose federal relief. *Id.* at 2073. The Court also found this statutory construction supported by the legislative purpose of merely giving state agencies a limited opportunity to settle grievances in a voluntary manner on the local level. *Id.* at 2074. *See also Silver v. Mohasco Corp., supra,* 602 F.2d at 1083; *Voutsis v. Union Carbide Corp.,* 452 F.2d 889 (2d Cir. 1971), *cert. denied,* 406 U.S. 918, 92 S.Ct. 1768, 32 L.Ed.2d 117 (1972).

In the instant case, defendants do not dispute that plaintiff's charge with the EEOC, which included a copy of the complaint in this action, was referred to the NYSDHR by the EEOC, that the charge was received by that agency and that the EEOC deferred to the NYSDHR for 60 days. Regardless then of whether the NYSDHR had a sufficient opportunity to consider Spirt's grievance, it is clear under *Oscar Mayer* that the jurisdictional requirement of § 706(b) has been fulfilled.

### C. The Merits

Turning to the substance of the Title VII claim, Spirt relies primarily [13] on § 703(a)(1) of the Act, 42 U.S.C. § 2000e–2(a)(1), which provides:

> (a) It shall be an unlawful employment practice for an employer—
>
> > (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . .

---

**11.** Section 706(b) of Title VII, proscribes further action by the EEOC

> before the expiration of sixty days after proceedings have been *commenced* under the State or local law, unless such proceedings have been earlier terminated . . . .
>
> 42 U.S.C. § 2000e–5(c) (emphasis added).

**12.** Section 706(b) continues:

> If any requirement for the commencement of such proceedings is imposed by a State or local authority other than a requirement of the filing of a written and signed statement of the facts upon which the proceeding is based, the proceeding shall be deemed to have been commenced for the purposes of this subsection at the time such statement is sent by registered mail to the appropriate State or local authority.
>
> 42 U.S.C. § 2000e–5(c).

**13.** Spirt also claims that she is entitled to summary judgment under § 703(a)(2) of Title VII, which makes it unlawful for an employer "to limit, segregate, or classify his employees or *applicants for employment in any way which* would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(2). However, inasmuch as the Court finds plaintiff's claim under § 703(a)(1) meritorious, it need not address this alternative basis for her Title VII action.

This section was construed by the Supreme Court in the context of an employee pension plan providing different terms for men and women in *City of Los Angeles v. Manhart*, 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978). *Manhart* struck down as violative of § 703(a)(1) an employer-operated pension fund which required women employees to contribute more than their male counterparts in order to receive equal periodic benefits upon retirement.

The Court found the plan unlawfully discriminatory although its differentiation in treatment was based upon the unquestionably accurate generalization that women as a class live longer than men as a class. Emphasizing that § 703(a)(1)'s proscription of discrimination with respect to compensation referred specifically to the "individual," the Court held that the section "precludes treatment of *individuals* as simply components of racial, religious, sexual or national class." 435 U.S. at 708, 98 S.Ct. at 1375. The Court recognized that unless women as a class made greater contributions to the plan, they would be subsidized by the class of male employees. However, it believed that the language of § 703(a)(1) evidenced Congress' judgment that fairness to individuals in matters of discrimination in employment covered by the statute were to take precedence over fairness to various classes affected thereby. *Id.* at 708–09, 98 S.Ct. 1370. It also found this construction consistent with the statutory goal of replacing "traditional assumptions about groups" with "thoughtful scrutiny of individuals," since a significant part of the longevity differential between men and women might well result from social factors rather than from innate biological characteristics. *Id.* at 709–10, 98 S.Ct. 1370. Finally, while recognizing that insurance is concerned with events that are individually unpredictable, the Court rejected the possibility that Congress intended a special definition of discrimination for employee group insurance plans. *Id.* at 710. The City of Los Angeles' plan was thus unlawful despite the validity of its general premise for the simple reason that many individual women would receive smaller paychecks than their corresponding male colleagues while working, but would live no longer than the men, thus receiving no compensating advantage during retirement.

The pension plans under attack in the instant case, like that involved in *Manhart*, differentiate in their treatment of women and men based on the fact that women participants as a class enjoy greater longevity than their male counterparts. However, because *individual* women will not live any longer than men who made the same contributions to the plans during their working years, but who receive larger monthly pension checks upon retirement, the program suffers from the same deficiency as the plan in *Manhart*.

TIAA and CREF maintain that *Manhart* does not control this case because here the differentiation in treatment of the sexes is in benefits, not in contributions. The Court, however, finds this distinction without significance. Section 703(a)(1) outlaws sex discrimination by employers with respect to "compensation." Justice Stevens' opinion for the majority in *Manhart* makes clear that both contributions and benefits constitute "compensation" within the meaning of the statute. 435 U.S. at 712 n. 23, 98 S.Ct. 1370. Thus, absent some affirmative justification, the discrimination against individual women in pension benefits involved in the instant case is as unlawful under § 703(a)(1) as the discrimination in contributions challenged in *Manhart*. Bernstein and Williams, *Sex Discrimination in Pensions: Manhart's Holding v. Manhart's Dictum*, 78 Colum.L.Rev. 1241, 1242 (1978); *1977 Supreme Court, supra*, 92 Harv.L.Rev. at 309.

### D. Definition of "Employer" Under Title VII

■ The present case is also distinguishable from *Manhart*, TIAA and CREF assert, because it involves a retirement system administered by private insurance companies, not by the employer alone. It is their position that they cannot be held to have violated Title VII because § 703(a) covers only employer-operated pension plans.

The Court agrees that in most instances pension plans of private insurers will not be subject to the dictates of Title VII, since § 703(a) makes unlawful only discriminatory employment practices of an "employer." However, the term "employer" under Title VII has been construed in a functional sense to encompass persons who are not employers in conventional terms, but who nevertheless control some aspect of an individual's compensation, terms, conditions, or privileges of employment. *See, e. g., Sibley Memorial Hospital v. Wilson*, 160 U.S.App. D.C. 14, 488 F.2d 1338 (1973); *Puntolillo v. New Hampshire Racing Comm'n*, 375 F.Supp. 1089 (D.N.H.1974); *Hairston v. McLean Trucking Co.*, 62 F.R.D. 642 (M.D. N.C.1974), *vacated on other grounds*, 520 F.2d 226 (4th Cir. 1975). *See also Manley v. Mobile County*, 441 F.Supp. 1351, 1355–56 (S.D.Ala.1977); *Curran v. Portland Superintending School Committee*, 435 F.Supp. 1063, 1072–73 (D.Me.1977).

Holding responsible those who control the aspects of employment accorded protection under Title VII is consistent with the congressional intent both that the Act's effectiveness not be frustrated by an employer's delegating authority for its employees' compensation, terms, conditions, or privileges of employment to third parties,[14] *see Manhart, supra*, 435 U.S. at 718 n. 33, 98 S.Ct. 1370, and that the Act be interpreted liberally in order to achieve its remedial purpose of eradicating discrimination in employment.[15] *See, e. g., Silver v. Mohasco Corp., supra*, 602 F.2d at 1087; *Craig v. Department of Health, Education & Welfare*, 581 F.2d 189, 193 (8th Cir. 1978); *Bell v. Brown*, 181 U.S.App.D.C. 226, 230, 557 F.2d 849, 853 (1977); *Puntolillo, supra*, 375 F.Supp. at 1091–92.

Although in the present case LIU is plaintiff's employer in the usual sense, Spirt contends that TIAA and CREF have been delegated authority with respect to her pension plan sufficient to require them to share LIU's responsibility as "employer" for purposes of § 703(a)(1). The Court agrees. Educational institutions such as LIU have delegated their responsibility for and control over employee annuity plans to TIAA and CREF. To hold that discrimination in that aspect of employee compensation cannot be fully remedied under Title VII because of such delegation would impair the effectiveness of the Act. It is significant in the Court's view that TIAA and CREF are non-profit corporations whose sole reason for existence is to serve Spirt's direct employer, LIU, and other similar institutions by relieving them of the burden of establishing and administering their own insurance programs for their employees and that participation in TIAA and CREF is compulsory for plaintiff as a tenured professor at LIU. Thus, the instant case is a far cry from the situation implicitly sanctioned by *Manhart*, 435 U.S. at 717–18, 98 S.Ct. 1370, in which an employer has set aside equal retirement contributions for each employee and let each retiree purchase the largest benefit which his or her accumulated contributions could command from any private insurer on the open market. *EEOC v. Colby College*, 589 F.2d 1139, 1146 (1st Cir. 1978) (Coffin, C. J., concurring); *1977 Supreme Court, supra*, 92 Harv.L.Rev. at 309 n. 57. Under the circumstances of this case, the Court concludes that TIAA and CREF, as well as LIU, are employers within the meaning of Title VII and thus that CREF is liable along with the university[16] for any violation of § 703(a)(1).

---

**14.** This intent is evident in § 701(b) of the Act, which defines employer under Title VII to include "any agent" of a covered employer. 42 U.S.C. § 2000e(b).

**15.** As the United States Court of Appeals for the District of Columbia has aptly stated:

To permit [a third party] to exploit circumstances peculiarly affording it the capability of discriminatorily interfering with an individual's employment opportunities with an-

other employer, while it could not do so with respect to employment in its own service, would be to condone continued use of the very criteria for employment that Congress has prohibited.

*Sibley Memorial Hospital v. Wilson, supra*, 160 U.S.App.D.C. at 17, 21, 488 F.2d at 1341.

**16.** Neither LIU nor TIAA or CREF on its behalf has made the argument advanced by the defendant college in the analogous case of *EEOC v. Colby College*, 589 F.2d 1139 (1st Cir. 1978),

### E. Bennett Amendment

■ TIAA and CREF also claim that their annuity plans are not proscribed by Title VII by virtue of the Bennett Amendment, § 703(h) of the Act, 42 U.S.C. § 2000e–2(h). The Bennett Amendment provides that an employer's differentiation on the basis of sex in determining the wages or compensation paid to its employees will not violate Title VII if such differentiation is authorized by the Equal Pay Act, 29 U.S.C. § 206(d). The Equal Pay Act requires employers to pay men and women equal wages for equivalent work unless one of four specified exceptions is met. Defendants contend that the fourth exception, which authorizes a "differential based on any other factor other than sex," 29 U.S.C. § 206(d)(1)(iv), applies here because the difference in benefits provided to men and women is based on the factor of longevity rather than sex.

Although this argument was expressly rejected by the Supreme Court in *Manhart*, 435 U.S. at 711–14, 98 S.Ct. 1370, defendants assert that *Manhart* does not control the present case because the plan there involved unequal employee contributions and equal benefits while the opposite is involved here. They appear to base this argument on the fact that the Wage and Hour Administrator's regulation, 29 C.F.R. § 800.116, while silent on the permissibility of different employee contribution rates accompanied by equal benefits, such as the plan in *Manhart* involved, expressly provides that either equal employer contributions or equal benefits will satisfy the dictates of the Equal Pay Act. 29 C.F.R.

§ 800.116(d) (1978). However, Justice Stevens' opinion makes clear that even assuming that 29 C.F.R. § 800.116 could be interpreted as sanctioning unequal employee contributions when accompanied by equal benefits, the Court found a conflicting regulation of the Administrator, 29 C.F.R. § 800.151 [17] more persuasive. 435 U.S. at 714 n. 26, 98 S.Ct. 1370; *see EEOC v. Colby College, supra*, 589 F.2d at 1144 n. 9.

Moreover, in light of *Manhart*, the Administrator has proposed that 29 C.F.R. § 800.116(d) be amended so as to require that both employee contributions and benefits be equal under the Equal Pay Act. 43 Fed.Reg. 38,029 (1978). The Court thus finds the asserted distinction between *Manhart* and the present case without significance. As in *Manhart*, the record contains no evidence that any factor other than the employee's sex was taken into account in calculating the differentials in benefits received by men and women. Therefore, as in *Manhart*, "one cannot 'say that an actuarial distinction based entirely on sex is "based on any other factor other than sex." Sex is exactly what it is based on.'" 435 U.S. at 712–13, 98 S.Ct. at 1377, 1378, *quoting Manhart v. City of Los Angeles*, 553 F.2d 581, 588 (1976). Accordingly, defendants have not established a defense based upon the Bennett Amendment.

### F. Business Necessity

■ The Court is also unpersuaded by TIAA and CREF's argument that "business necessity" insulates them from what would otherwise be a Title VII violation. Assuming *arguendo* that the business necessity defense is applicable to practices which are

---

that the educational institution cannot be charged with a violation of Title VII because TIAA and CREF contract directly with individual faculty members. In any event, this Court agrees with the First Circuit that the college's or university's involvement in the overall program is sufficient to hold it responsible under the Act: As the Court observed in *Colby College*, "[The educational institution] is more than a broker, or other intermediary, that enables the parties to enter into the arrangement." *Id.* at 1141. The institution's adoption of the TIAA and CREF plans "'constitutes affirmative, active participation,' without which

'the challenged program could not operate.' [The institution] requires participation in the plan for all eligible employees and the amount of premium payments is determined under a formula established by [it]." *Id., quoting Spirt v. TIAA*, 416 F.Supp. 1019, 1021, 1022 (S.D.N.Y.1976). The institution also materially assists TIAA and CREF by collecting the employees' contributions through salary deductions and forwarding the contributions to the insurers.

17. That regulation condemns wage differentials based on the grouping of employees by sex for purposes of cost comparisons.

facially discriminatory,[18] *but see 1977 Supreme Court*, 92 Harv.L.Rev. at 305 n. 37, the Court does not agree with TIAA and CREF that the sex distinctions drawn by them are "reasonably necessary to the normal operation" of their plans. *See Manhart, supra*, 435 U.S. at 716 n. 30, 98 S.Ct. 1370. Defendants emphasize that insurance deals with risks that cannot be evaluated for an individual, but which must be accurately predicted on a group basis to ensure financial reliability. The short answer to this argument is that the Court in *Manhart* made it clear that the impossibility of individual prediction could not justify resort to classifications proscribed by Title VII. *Id.* at 710, 98 S.Ct. 1370.

The insurance industry's reliance on the concept of equity also fails to legitimize the instant discrimination. In essence, TIAA and CREF contend that unless they are allowed to continue to use sex-segregated mortality tables, men will withdraw from defendants' programs and enroll in other plans which do not require them to assume more than their "actuarial share" of the annuity burden, resulting in TIAA and CREF's eventual insolvency. The Court finds no support for this dire prediction. Since, as in *Manhart*, participation in the plans is generally mandatory, "an employee who wants to leave the plans must also leave his job, and few workers will quit because one of their fringe benefits could theoretically be obtained at a marginally lower price on the open market."[19] 435 U.S. at 716 n.30, 98 S.Ct. at 1379 n.30. That male participants would even consider an adjustment in benefits sufficient to warrant a change in plans seems particularly unlikely in the case of TIAA and CREF because their plans offer attractive features not generally available on the open market such as portability between employers and immediate vesting. Bernstein & Williams, *Title VII and the Problem of Sex Classifications in Pension Programs*, 74 Colum.L.Rev. 1203, 1228 n. 94 (1974). The Court is also unconvinced that men would be likely to consider the equalization in treatment unfair: "The fundamental perception of equality with respect to compensation turns on the relative daily purchasing power of individual employees rather than the comparative actuarial estimates of a pension's total value. . . . After retirement, since the primary purpose of pensions is to ensure adequate cash flow to meet daily short term needs, the size of the monthly benefits would be the crucial element." *1977 Supreme Court, supra*, 92 Harv.L.Rev. at 305.

Moreover, contrary to TIAA and CREF's prediction, the result in this case will not "revolutionize the insurance and pension industries." *Manhart, supra*, 435 U.S. at 717, 98 S.Ct. at 1380. It is important to note that although CREF's activities fall within Title VII's jurisdiction in this case, private insurance companies are exempt from the dictates of the Act unless they are both functioning as employers within the meaning of the statute and are engaged in conduct which does not constitute the business of insurance under the McCarran Act. Moreover, the Court believes that the formulation of appropriate relief can avoid drastic changes in the legal rules governing the plans, which TIAA and CREF contend would jeopardize their solvency and the insureds' benefits. Furthermore, nothing in this decision precludes consideration of the composition of the work force as a whole in

---

18. TIAA and CREF apparently ignore the fact that the instant case involves a practice that on its face discriminates against women in contending that plaintiff cannot establish a violation of Title VII because defendants did not intend to discriminate. Whatever argument can be made as to the necessity of proving intent to establish a prima facie violation of § 703(a)(1) when dealing with a facially neutral plan, *see Nashville Gas Co. v. Satty*, 434 U.S. 136, 144, 98 S.Ct. 347, 54 L.Ed.2d 356 (1977), it is established that no intent need be shown where, as here, the practice in question on its face discriminates against women. *See Manhart, supra*, 435 U.S. at 716, 98 S.Ct. 1370.

19. Whether men could in fact obtain insurance at a lower price on the open market is questionable. Because of economies of scale, an individual usually cannot purchase insurance as cheaply alone as he can as a member of a group. *1977 Supreme Court, supra*, 92 Harv.L. Rev. at 310.

determining the cost of defendants' annuity plans, see Manhart, supra, 435 U.S. at 718, 98 S.Ct. 1370, or the use of other risk classifications not proscribed by Title VII to ensure reliability and equity.

For the foregoing reasons, the Court concludes that CREF and LIU have violated § 703(a)(1) of Title VII. Accordingly, Spirt's motion for summary judgment is granted as to these defendants, and TIAA and CREF's cross-motion for summary judgment is denied with respect to CREF.

## II. *Equal Protection*

Since the Court has concluded that TIAA is exempt from the dictates of Title VII by virtue of the McCarran Act, it must consider Spirt's alternative argument that defendants' use of sex-segregated mortality tables in the computation of annuity benefits denies her her Fourteenth Amendment right to equal protection of the laws in violation of 42 U.S.C. § 1983 and § 1985(3). While TIAA and CREF assert that there can be no equal protection violation here because defendants are private parties, and there is no state action, plaintiff takes the position that there is sufficient state involvement to bring this case within § 1983. Plaintiff further contends that even if there is no state action, defendants' conduct is proscribed by § 1985(3), which outlaws purely private conspiracies to violate constitutional rights.

### § 1983

To state a claim for relief under § 1983, plaintiff must establish that defendants have deprived her of a right secured by the Constitution or laws of the United States and that, in so doing, defendants acted under color of state law.[20] *Flagg Brothers, Inc. v. Brooks,* 436 U.S. 149, 155, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978). The right relied on by Spirt is the Fourteenth Amendment guarantee of freedom from the denial by the state of the equal protection of the laws. Thus, Spirt must demonstrate both that defendants have acted under color of law and that their actions are properly attributable to the State of New York. *Id.* at 156, 98 S.Ct. 1729.

Although TIAA and CREF are private entities, Spirt alleges that their actions may be considered those of the state because, as insurance companies, their business involves substantial public interest and is the subject of substantial regulation by the State of New York. Plaintiff notes specifically that the New York Superintendent of Insurance is required to and does approve all TIAA contracts, CREF certificates and various other materials. The TIAA contracts as well as some of the other materials set forth the sex-segregated rate and mortality tables used by defendants to compute annuity benefits.

■ That a business is "affected with a public interest" does not suffice to convert its actions into those of the state for purposes of the Fourteenth Amendment. *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 353–54 & n. 9, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974); *see, e. g., Evans v. Newton,* 382 U.S. 296, 300, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966); *Civil Rights Cases,* 109 U.S. 3, 8, 3 S.Ct. 18, 27 L.Ed. 835 (1883). Nor does the fact that the business is subject to extensive and detailed state regulation serve to transform its activities into governmental ones. *Jackson, supra,* 419 U.S. at 350, 95 S.Ct. 449; *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 176–77, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972). Rather, "the inquiry must be whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." *Jackson, supra,* 419 U.S. at 351, 95 S.Ct. at 453; *accord, Moose Lodge, supra,* 407 U.S. at 176–77, 92 S.Ct. 1965.

---

**20.** 42 U.S.C. § 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

In *Jackson,* the Supreme Court held that a state utility commission's approval of the defendant utility company's tariff which set forth the company's right to terminate service for nonpayment without a hearing did not transmute the utility's termination practice into state action "where the commission has not put its own weight on the side of the . . . practice by *ordering* it." 419 U.S. at 357, 95 S.Ct. at 456–457 (emphasis added). Subsequent to *Jackson,* in *Flagg Brothers, Inc. v. Brooks,* 436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978), the Supreme Court unequivocally pronounced that the acts of a private entity will not be attributed to the state unless the state actually *compels* the action. There, the plaintiffs challenged the defendant storage company's sale of their property without a prior hearing. Although a state statute specifically authorized the sale by the defendant, the Court held there was no state action because the state was in no way responsible for the private defendant's action, action which the state statute permitted, but did not compel. 436 U.S. at 165, 98 S.Ct. 1729. In the present case, there can be no claim that the State of New York has compelled TIAA and CREF to use sex-segregated mortality tables. Therefore, under the rationale of *Jackson* and *Flagg Brothers,* there is no state action.

It is arguable, however, that *Flagg Brothers* and *Jackson* do not control the instant case. This Circuit has held that state action analysis requires consideration of the nature of the right allegedly infringed as well as the extent of the state's involvement, *e. g., Taylor v. Consolidated Edison Co.,* 552 F.2d 39, 42 (2d Cir.), *cert. denied,* 434 U.S. 845, 98 S.Ct. 147, 54 L.Ed.2d 111 (1977); *Weise v. Syracuse University, supra,* 522 F.2d at 405–06; *Jackson v. Statler Foundation,* 496 F.2d 623, 629 (2d Cir. 1973), *cert. denied,* 420 U.S. 927, 95 S.Ct. 9124, 43 L.Ed.2d 397 (1975), and that when the conduct complained of is race or sex discrimination, less state involvement may be required to find state action than when other interests are at stake. *Weise v. Syracuse University, supra,* 522 F.2d at 405–06; *Jackson v. Statler Foundation, supra,* 496 F.2d at 629, 635. Because *Jackson* and *Flagg Brothers* involved deprivations of the right to procedural due process, not class-based discrimination, it is thus arguable [21] that in the present case conduct short of state compulsion could be deemed to constitute state action.

■ Even in the context of race discrimination [22] by a heavily regulated business,

---

**21.** Because the Court finds no state action in the present case even under a standard less stringent than that espoused in *Jackson* and *Flagg Brothers,* it need not decide whether such a less stringent standard actually governs the analysis herein. The Court notes, however, that it is at least questionable whether the Supreme Court would find *Jackson* and *Flagg Brothers* inapplicable to plaintiff's claim of sex discrimination, both because the high Court's decisions do not yet seem to have recognized that the degree of state involvement required to find state action is related to the right involved, *Jackson v. Metropolitan Edison Co., supra,* 419 U.S. at 373–74, 95 S.Ct. 449 (Marshall, J., dissenting), and because Justice Rehnquist's majority opinion in *Flagg Brothers* seems to rely on the race discrimination cases of *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), and *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), to support the necessity of a state mandate to find state action. *See* 436 U.S. at 164–65, 98 S.Ct. 1729.

**22.** The Second Circuit has declined to decide whether sex discrimination should be equated to race discrimination for purposes of state action analysis, but has held that, like race discrimination, discrimination on account of sex requires less governmental involvement to find state action than was required in the college discipline cases of *Powe v. Miles,* 407 F.2d 73 (2d Cir. 1968), and *Grafton v. Brooklyn Law School,* 478 F.2d 1137 (2d Cir. 1973). *Weise v. Syracuse University,* 522 F.2d 397, 406 (2d Cir. 1975). The strict scrutiny afforded on the merits in cases involving equal protection challenges to race discrimination, *e. g., Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954), as compared to the intermediate level of scrutiny which has apparently been adopted in cases involving sex discrimination, *e. g., Orr v. Orr,* 440 U.S. 268, 99 S.Ct. 1102, 59 L.Ed.2d 306 (1979); *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1977), would suggest that somewhat more governmental involvement would be required to find state action in sex discrimination cases than in race discrimination cases. However, as set forth *infra,* the

however, the Supreme Court in *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), made it clear that no state action will be found unless, at a minimum, it can be said that the state has fostered or encouraged the alleged discrimination. 407 U.S. at 175–77 & n. 3, 92 S.Ct. 1965. In the present case, the New York Insurance Department plays absolutely no part in establishing or enforcing defendants' use of sex-segregated mortality tables. Nor is there any suggestion that the New York statutes and regulations governing insurance are intended overtly or covertly to foster or encourage discrimination against women. Although the Superintendent of Insurance approves defendants' contracts and certificates, such action in no way indicates encouragement for particular terms therein, but merely constitutes a determination that the contracts and certificates are not unlawful. *See Reichardt v. Payne,* 396 F.Supp. 1010, 1015–16 (N.D.Cal.1975). Such an exercise of a choice allowed by state law where the initiative comes solely from the private party and not from the state is insufficient to constitute state action. Accordingly, Spirt fails to state a claim under § 1983.

### § 1985

█ Plaintiff appears to place more stock in her argument that defendants have engaged in a conspiracy to deprive her of her Fourteenth Amendment right to equal protection that, even absent state action, is actionable under 42 U.S.C. § 1985(3).[23] This allegation is derived from *Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 28 L.Ed.2d 338 (1971), in which the Supreme Court held that certain wholly private conspiracies to deprive persons of equal protection of the laws or equal privileges and immunities under the laws may be redressed under § 1985(3) if accompanied by "some racial, or perhaps otherwise classbased, invidiously discriminatory animus behind the conspirators' action." *Id.* at 101–02, 91 S.Ct. at 1798.

*Griffin* upheld a remedy under § 1985(3) for black citizens assaulted in the course of interstate travel on a public highway on the basis of section 2 of the Thirteenth Amendment which granted Congress the authority to create "a statutory cause of action for Negro citizens who have been the victims of conspiratorial, racially discriminatory private action" intended to deprive them of their basic rights. *Id.* at 105, 91 S.Ct. at 1800. The Court based its holding alternatively on the right to interstate travel, a right and privilege of national citizenship assertable against private as well as state interference. *Id.* at 105–06, 91 S.Ct. 1790, *citing Shapiro v. Thompson,* 394 U.S. 618, 629–31, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); *id.* at 642–44, 89 S.Ct. at 1335–1336 (concurring opinion); *United States v. Guest,* 383 U.S. 745, 757–60 & n. 17, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966); *Twining v. New Jersey,* 211 U.S. 78, 97, 29 S.Ct. 14, 53 L.Ed. 97 (1908); *Slaughter-House Cases,* 16 Wall. 36, 83 U.S. 36, 79–80, 21 L.Ed. 394 (1873);

---

Court finds inadequate state involvement to constitute state action even under the more permissive standards arguably applicable to allegations of race discrimination.

**23.** 42 U.S.C. § 1985(3) provides:

If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

*Crandall v. Nevada,* 6 Wall. 35, 73 U.S. 35, 44, 48–49, 18 L.Ed. 744 (1868); *Passenger Cases,* 7 Haw. 283, 48 U.S. 283, 492, 12 L.Ed. 702 (1849) (Taney, C. J., dissenting).

In the instant case, Spirit does not allege a conspiracy to deprive her of her rights under the Thirteenth Amendment or her right to interstate travel. Rather she claims to be the victim of a sex-based conspiracy[24] to deprive her of the right to equal protection of the laws under the Fourteenth Amendment. Whether § 1985(3) extends the Fourteenth Amendment's protections to private action is an issue left open by the Supreme Court in *Griffin,* 403 U.S. at 107, 91 S.Ct. 1790, and which has since divided the lower courts.[25] However, the question appears to have been recently resolved in *Great American Federal Savings & Loan Ass'n v. Novotny,* —— U.S. ——, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979). There the Supreme Court clearly stated that § 1985(3) creates no substantive rights, but is rather "a purely remedial statute, providing a civil cause of action when some otherwise defined federal right . . is breached by a conspiracy in the manner defined by the section." 99 S.Ct. at 2349, 2351. By contrast to the right under the Thirteenth Amendment to be free from the incidents of slavery and the right to interstate travel, the federal right to equal protection under the Fourteenth Amendment relied on by plaintiff affords protection only against unequal treatment by the state. *Jackson v. Metropolitan Edison Co., supra,* 419 U.S. at 349, 95 S.Ct. 449; *Moose Lodge No. 107 v. Irvis, supra,* 407 U.S. at 172, 92 S.Ct. 1965; *Shelley v. Kraemer,* 334

U.S. 1, 13, 68 S.Ct. 836, 92 L.Ed. 1161 (1948); *see United Steelworkers of America v. Weber,* —— U.S. ——, ——, 99 S.Ct. 2721, 61 L.Ed.2d 400 (1979). Thus, state action is an essential element of a § 1985(3) claim premised thereon. As Justice Stevens stated in his concurring opinion in *Novotny* :

Some privileges and immunities of citizenship, such as the right to engage in interstate travel and the right to be free of the badges of slavery, are protected by the Constitution against interference by private action, as well as impairment by state action. Private conspiracies to deprive individuals of these rights are, as this Court held in *Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338, actionable under § 1985(c) without regard to any state involvement.

Other privileges and immunities of citizenship such as the right to due process of law and the right to the equal protection of the laws are protected by the Constitution only against state action. *Shelley v. Kraemer,* 334 U.S. 1, 13, 68 S.Ct. 836, 842, 92 L.Ed. 1161. If a state agency arbitrarily refuses to serve a class of persons—Chinese Americans, for example, see *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220—it violates the Fourteenth Amendment. Or if private persons take conspiratorial action that prevents or hinders the constituted authorities of any State from giving or securing equal treatment, the private persons would cause those authorities to violate the Fourteenth Amendment; the

---

**24.** This Circuit has not reached the issue whether sex-based conspiracies have the requisite "class-based, invidiously discriminatory animus" demanded by *Griffin. Weise v. Syracuse University,* 522 F.2d 397, 408–09 n. 16 (2d Cir. 1975). However, the Third Circuit, in a persuasive opinion, has held that they do. *Novotny v. Great American Federal Savings & Loan Ass'n,* 584 F.2d 1235, 1243–44 & n. 36 (3d Cir. 1978) (en banc), *rev'd on other grounds,* —— U.S. ——, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979); *accord, Conroy v. Conroy,* 575 F.2d 175, 177 (8th Cir. 1978).

**25.** *Compare Bellamy v. Mason's Stores, Inc.,* 508 F.2d 504 (4th Cir. 1974) (state action re-

quired); *Dombrowski v. Dowling,* 459 F.2d 190 (7th Cir. 1972) (same); *and Weiss v. Willow Tree Civic Ass'n,* 467 F.Supp. 803 (S.D.N.Y. 1979) (same), *with Action v. Gannon,* 450 F.2d 1227 (8th Cir. 1971) (state action not required). *See also Weise v. Syracuse University, supra,* 522 F.2d at 401, 408 (error to dismiss for lack of state action § 1985(3) claim alleging conspiracy to deprive plaintiffs of equal protection of the laws); *Frantz, Congressional Power to Enforce the Fourteenth Amendment against Private Acts,* 73 Yale L.J. 1353 (1964); Note, *Federal Power to Regulate Private Discriminations: The Revival of the Reconstruction Era Amendments,* 74 Colum.L.Rev. 451, 516–17 (1974).

private persons would then have violated § 1985(c).

If, however, private persons engage in purely private acts of discrimination—for example, if they discriminate against women or against lawyers with a criminal practice, see *Dombrowski v. Dowling,* 459 F.2d 190, 194–196—they do not violate the Equal Protection Clause of the Fourteenth Amendment. The rights secured by the Equal Protection and Due Process Clauses of the Fourteenth Amendment are rights to protection against unequal or unfair treatment by the State, not by private parties. Thus, while § 1985(c) does not require that a defendant act under color of state law, there still can be no claim for relief based on a violation of the Fourteenth Amendment if there has been no involvement by the State. The requirement of state action, in this context, is no more than a requirement that there be a constitutional violation.

*Id.* 99 S.Ct. at 2354–55 (Stevens, J., concurring) (footnotes omitted).

In the present case, the Court has held that there is no state action. Consequently, Spirt cannot state a claim under 42 U.S.C. § 1985(3). Inasmuch as plaintiff has not established either a Title VII or Equal Protection violation by TIAA, her motion for summary judgment is denied as to that defendant. TIAA's cross-motion for summary judgment is granted.

### III. *Relief*

The Court faces the task of framing a remedy that will eliminate CREF and LIU's unlawful discrimination against plaintiff while at the same time safeguarding the legal and equitable rights of others potentially affected by a decree and minimizing the financial dangers which could result from the restructuring of a major retirement program.

The Court's task is eased by the fact that Spirt is a "deferred annuitant," who has not yet begun to receive annuity benefits. The sex-based mortality tables which result in the instant violations of Title VII are not used by CREF until the date of retirement. Prior to that time, premium payments to CREF purchase "accumulation units," each unit representing a small share of participation in every investment in the CREF portfolio. The number of accumulation units purchased with each monthly payment varies depending on the current value of CREF's accumulation fund and the total number of accumulation units outstanding among all participants. At retirement, a participant's total accumulation units are converted into a fixed number of "annuity units." The number of annuity units received is based essentially on the number of accumulation units owned by the participant, the type of annuity selected, and the life expectancy of the annuitant(s) calculated according to the mortality tables used by CREF. Under present practice, if a male and a female participant of the same age retire with the same number of accumulation units and they choose, for example, the same single life annuity, the woman will be allocated a smaller number of annuity units than the man (leading to smaller monthly benefits) because her life expectancy is deemed greater.

Because the number of annuity units to which Spirt is entitled has not yet been calculated, the Court believes that her rights can be adequately protected by the issuance of purely prospective relief. It therefore enjoins CREF from using sex-based mortality tables [26] in calculating the number of annuity units to which plaintiff and its other deferred annuitants are entitled.[27] The Court further enjoins LIU from

---

**26.** The Court includes within the term "sex-based mortality tables" mortality tables which use sex as one of several demarcating factors in determining longevity. Although one commentator has suggested that Justice Stevens' opinion in *Manhart* is unclear as to whether such tables would pass muster under Title VII, *1977 Supreme Court, supra,* 92 Harv.L.Rev. at 310, the Court believes that any determination

of rates or benefits based on such tables would also be unlawful as it would still result in discrimination between men and women who were alike in all relevant characteristics except sex. *See id.* at 310 & n. 61.

**27.** Although plaintiff's motion for class certification was denied by this Court, the decision was predicated in part on TIAA and CREF's

both making contributions on behalf of its employees and from requiring its employees to contribute to any retirement plan that uses sex-based mortality tables in calculating periodic benefits.

The above remedy avoids the necessity of any retroactive payments or other increase in costs that might jeopardize the financial stability of the TIAA and CREF plans. *See generally Manhart, supra,* 435 U.S. at 718–23, 98 S.Ct. 1370; *Colby College, supra,* 589 F.2d at 1144–46. Moreover, since the only participants who need be affected are deferred annuitants such as Spirt, the relief ordered by the Court should also avoid any possible question of impairment of the contract rights of male participants,[28] *see Colby College, supra,* 589 F.2d at 1145, or violation of the Equal Pay Act.[29]

Compliance with the Court's decree may only require new mathematical computations based on currently available statistics. The Court is mindful, however, of the Supreme Court's admonition in *Manhart* as to "the difficulty of amending a major pension plan, a task that cannot be accomplished overnight." 435 U.S. at 719 n. 36, 98 S.Ct. at 1381 n. 36. It therefore stays enforcement of its decree until the termination of the 1979–80 academic year: CREF is direct-ed to comply with the Court's order with regard to the computation of annuity units for all participants retiring on or after May 1, 1980; LIU is directed to comply with the Court's order with regard to all employment contracts becoming effective on or after June 1, 1980.

Settle order on notice.

## OPINION ON MOTION FOR REARGUMENT

Defendant College Retirement Equities Fund ("CREF") moves for reargument pursuant to Rule 9(m) of the General Rules of this Court, claiming that there is an apparently inadvertent inconsistency between the stated purpose of the remedy set forth in the Court's Opinion dated August 9, 1979 ("the Opinion") and the actual effect of the relief granted. Specifically, CREF contends that the Court's order enjoining it from using sex-segregated mortality tables in the computation of retirement benefits ought to apply only to the calculation of annuity units based on contributions made starting May 1, 1980, rather than to all annuity units computed on or after that date. Otherwise, according to CREF, the remedy provided will, in contravention of the Court's stated purpose, have

acknowledgment that any relief would of necessity be class-oriented. 416 F.Supp. 1019, 1023–25 (S.D.N.Y.1976).

**28.** The CREF certificates do not promise that any particular mortality tables will be used in the calculation of the annuity units to which a participant is entitled. To the extent TIAA may choose voluntarily to abandon its use of sex-segregated mortality tables in order to qualify as a retirement plan that may be used by LIU, it too may do so without impairing the contract rights of male participants. Although the TIAA contracts provide that premiums will be applied to purchase annuities according to a rate schedule that currently incorporates sex-based mortality tables, the contracts also provide that TIAA may at any time substitute a new rate schedule applicable to subsequent premiums.

**29.** As previously noted, the Equal Pay Act forbids employers subject to its terms from paying men and women unequal wages for equivalent work. However, the statute specifically pro-vides "[t]hat an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee." 29 U.S.C. § 206(d)(1). Based on this proviso, TIAA and CREF have contended that any relief which lowered the benefits of male participants would "reduce the wage rate of any employee" in violation of the Equal Pay Act. While the Court need not determine the validity of this argument in view of the relief ordered herein, it notes that defendants appear to presume without authority that the proviso is applicable to relief formulated to obtain compliance with Title VII as opposed to the Equal Pay Act. It also notes that whether retirement benefits are "wages" within the meaning of the Equal Pay Act is an open question which the Supreme Court has declined to resolve. *See Manhart, supra,* 435 U.S. at 712 n. 23, 98 S.Ct. 1370. *See also* Bernstein & Williams, *Title VII and the Problem of Sex Classifications in Pension Programs,* 74 Colum.L.Rev. 1203, 1225–26 (1974).

a retroactive impact and result in the violation of the legal and equitable rights of male deferred annuitants. Although the effect of the remedy granted was by no means inadvertent[1] and the Court hereby reaffirms its Opinion, it will nevertheless briefly indicate why it believes there is no inconsistency between its intended purpose and the relief ordered.

The Court's intention to avoid retroactive relief was based on the Supreme Court's cautioning in *Manhart* that the rules applicable to pension funds found to have violated Title VII in good faith should generally not be applied retroactively, since requiring pension plans to make retroactive payments could jeopardize the insurer's solvency and ultimately the insureds' benefits. *City of Los Angeles Dept. of Water & Power v. Manhart*, 435 U.S. 702, 720–22, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978). However, in contrast to *Manhart*, where the lower courts had awarded payments to the entire class of female employees and retirees of the difference between male participants' past contributions to the pension fund and their own, *id.* at 718, 719 n.36, 98 S.Ct. 1370, the relief granted in the instant case will

not involve any unanticipated payments by CREF which would force it to meet unchanged obligations with diminished assets. Rather, the relief granted in this case will merely vary the future allocation and distribution of an unaffected amount of assets. For this reason, the Court believes that the remedy it has fashioned does not involve impermissible retroactive relief within the meaning of *Manhart*.[2]

The Court also disagrees with CREF that the remedy it has ordered must be amended to avoid either a breach of contract or violation of the equitable rights of male deferred annuitants. CREF now for the first time points to four documents which it contends give deferred annuitants a contractual right, which CREF will have to breach to comply with this Court's order, to have the number of annuity units they will be awarded at the time of retirement calculated pursuant to an actuarial formula that will take into account their sex.[3] The Court, however, is not persuaded that any of these documents creates a contractual obligation by CREF to use sex-segregated mortality tables in computing benefits.[4] Moreover, even assuming such a promise by

1. The Court finds CREF's suggestion that the Court reached its result inadvertently to be somewhat disingenuous inasmuch as CREF's argument concerning the effect of the relief granted by the Court is based primarily not on the sea of documents submitted to the Court on defendants' initiative, but rather on supplementary submissions *made at the request of the Court* shortly before its Opinion was filed.

2. Retroactive relief within the meaning of *Manhart* would, in the Court's view, have been a relevant issue if this case had involved the rights not only of deferred annuitants such as Diana Spirt, but also of female retirees who had already received annuity checks smaller than those of their male counterparts and who sought to recover a money award for the difference in benefits heretofore provided.

3. Only one of these documents, the Report of Annuity Premiums and Benefits, was submitted by CREF in support of its and TIAA's motion and in opposition to plaintiff's cross-motion for summary judgment. Two of the remaining documents now relied on by CREF, the CREF certificate and the informational pamphlet *CREF Units at Work*, were thereafter supplied to the Court only at its specific request. The fourth document, a single page from the pamphlet describing CREF's Rules for Deter-

mining Benefits, has been submitted to the Court for the first time in connection with the instant motion for reargument. While the Court finds nothing on this page persuasive, it could not, in any event, accept an argument based on a single page from this pamphlet, which clearly begins in the middle of one section and which appears to end in the middle of another. Furthermore, ¶ 12 of the CREF certificate puts an end to any breach of contract argument premised on these Rules by providing that Rules "may [be] amend[ed] and add[ed] to . . . from time to time . . . ."

4. Of these four documents, the only one which the Court deems worthy of discussion is the CREF certificate. Although the certificate does state generally in ¶ 7 that the number of annuity units on the Annuity Starting Date will depend on listed factors, including "the age and sex of the Participant, and in the case of a Survivor Unit-annuity, the age and sex of the Participant's spouse," in marked contrast to the TIAA contract it does not set forth a sex-segregated rate schedule or otherwise indicate in any way how the participant's sex will affect the benefits provided. Under all the circumstances, the Court does not believe that this general reference to sex as a factor in computing benefits can be reasonably interpreted as a

CREF, the fact of the matter is that this Court has held the computation of CREF benefits based on sex-segregated tables to be unlawful and has enjoined their use. Therefore, any possible action against CREF for breach of contract should be barred by the doctrine of impossibility of performance.[5] J. Calamari & J. Perillo, *Contracts* § 13–4, at 486–87 (2d ed. 1977).

Furthermore, the Court does not believe that its decree results in the inequitable treatment of male deferred annuitants. For the reasons set forth on page —— of its Opinion, the Court simply does not credit CREF's argument that male participants have been induced to make contributions they otherwise would not have made to CREF based on the now-frustrated expectation that their sex would be taken into account in determining their future benefits. The unlikelihood of any such reliance is confirmed by a consideration of the general nature of participation in CREF which, unlike TIAA, involves assumption of risks by the participant, who knows that the benefits purchased by current contributions will be determined in the future based on a variety of variable factors, including possibly changed actuarial standards, which may leave him or her in a better or worse position than would be the case if the benefits were purchased immediately. Under all the circumstances, the Court cannot conclude that male deferred annuitants could have reasonably relied on CREF's use of sex-segregated mortality tables in computing their benefits to a degree that would justify prolonging the unlawful discrimination against female deferred annuitants found in this case.

The Court is also unpersuaded that the relief it has ordered contravenes the New York Insurance Law. CREF asserts that the New York statute contemplates that the difference in male and female life expectancies will be considered in computing individual annuity rates. However, as discussed at pages 1303–1304 and 1312–1313 of the Court's Opinion, the New York Insurance Law does not require the use of sex-segregated tables, but merely finds their use to be permissible.[6]

Accordingly, for the foregoing reasons, defendant CREF's motion for reargument is denied.

It is so ordered.

---

promise on the part of CREF to accord an advantage in benefits to male participants based on the greater longevity of men as a class over women as a class.

5. CREF has argued that because the relief ordered by the Court would *inter alia* breach the contractual rights of male deferred annuitants, the remedy must be modified so as to limit the injunction against the use of sex-segregated mortality tables to the computation of annuity units based on contributions made to the plan starting May 1, 1980. If, however, as CREF has argued, it is already contractually committed to calculate annuity units according to sex-

segregated mortality tables, the Court does not understand how banning the use of the subject tables with regard to benefits based on future contributions would avoid a breach of contract if enjoining their use as to benefits computed from past contributions would not.

6. Furthermore, even if the New York Insurance Law were inconsistent with the relief ordered by this Court to bring CREF into compliance with Title VII, such relief would still be permissible in view of the inapplicability of the McCarran-Ferguson Act to CREF in this case. *See generally* Opinion at 1301–1303.